NO. 21-1676

# United States Court of Appeals
## For the First Circuit

Karen Morales Posada, Williana Rocha,
Amanda Sarmento Ferreira Guimaraes, and Sara Barrientos

*Plaintiffs-Appellees,*

*v.*

Cultural Care, Inc.,

*Defendant-Appellant.*

*On Appeal from the United States District Court
for the District of Massachusetts
Hon. Indira Talwani, District Judge
Case No. 1:20-cv-11862-IT*

**BRIEF FOR PLAINTIFFS-APPELLEES**

DAVID H. SELIGMAN
TOWARDS JUSTICE
PO Box 371680
PMB 44465
Denver, Colorado 80237-5680
Ph: (720) 441-2236

PETER RUKIN
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, CA 94612
Ph: (415) 421-1800

MATTHEW C. HELLAND
NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810
San Francisco, CA 94104
Ph: (415) 277-7239

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT: THIS COURT LACKS
    JURISDICTION TO CONSIDER THIS APPEAL........................................4

STATEMENT OF THE CASE................................................................................4

    A.    PROCEDURAL BACKGROUND.......................................................4

    B.    FACTUAL ALLEGATIONS RELEVANT TO THIS APPEAL.........5

SUMMARY OF THE ARGUMENT ....................................................................12

ARGUMENT ........................................................................................................14

    C.    THIS COURT LACKS JURISDICTION TO HEAR THIS
        APPEAL.............................................................................................14

        1.    This Court Does Not Have Collateral Order Doctrine
               Jurisdiction to Consider Cultural Care's Derivative
               Sovereign Immunity Argument .................................................14

        2.    There Is No Pendent Appellate Jurisdiction to Consider
               the Remaining Issues ................................................................19

    D.    CULTURAL CARE IS NOT ENTITLED TO DERIVATIVE
        SOVEREIGN IMMUNITY WITH RESPECT TO THE STATE
        LAW CLAIMS...................................................................................25

        1.    Because It Is Not a Contractor or Agent of the Federal
               Government, Cultural Care is Not Protected by
               Derivative Sovereign Immunity.................................................25

        2.    Cultural Care Cannot Establish as a Matter of Law that It
               Acted Within Authority Validly Conferred by the Federal
               Government................................................................................30

    E.    PLAINTIFFS' STATE LAW CLAIMS ARE NOT
        PREEMPTED....................................................................................34

        1.    The Court Should Consider Preemption of the State
               Consumer Claims and the State Minimum Wage Claims
               Separately.................................................................................34

        2.    Congress Did Not Authorize the State Department to
               Preempt State Minimum Wage Law.........................................35

i

3.     The Au Pair Rules Do Not Preempt State Minimum Wage Law ................................................................39

F.     THE COMPLAINT PLAUSIBLY PLEADS THAT CULTURAL CARE IS A FLSA EMPLOYER .................................50

CONCLUSION .........................................................................53

## TABLE OF AUTHORITIES
### Cases

*Al Shimari v. CACI Premier Tech., Inc.*, 657 F. Supp. 2d 700 (E.D. Va. 2009)....24

*Al Shimari v. CACI Premier Tech., Inc.,* 775 F. App'x 758 (4th Cir. 2019) ...........14

*Al-Quraishi v. L-3 Servs., Inc.*, 657 F.3d 201 (4th Cir. 2011) .................................20

*Arizona v. United States*, 567 U.S. 387 (2012)................................................. 38, 40

*Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668 (1st Cir. 1998) .........49

*Beltran v. Interexchange, Inc.*, No. 14-CV-03074-CMA-KMT, 2016 WL 695967 (D. Colo. Feb. 22, 2016)............................................................ 30, 38, 48

*Betancourt v. Cultural Care, Inc.*, Case No. 2081CV0056 (Mass. Sup. Ct., Nov. 16, 2020).................................................................................................38

*Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36 (1st Cir. 2010) ................................................................................................................18

*Brown v. Fort Benning Fam. Communities LLC*, 108 F. Supp. 3d 1367 (M.D. Ga. 2015).................................................................................................29

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001)....................... 44, 47

*Butters v. Vance Int'l, Inc.*, 225 F.3d 462 (4th Cir. 2000).......................................23

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016)..................................... passim

*Capron v. Off. of Att'y Gen. of Massachusetts*, 944 F.3d 9 (1st Cir. 2019)..... passim

*City of New York v. F.C.C.*, 486 U.S. 57 (1988)......................................................33

*DeCanas v. Bica*, 424 U.S. 351 (1976)...................................................................39

*Dibble v. Fenimore*, 339 F.3d 120 (2d Cir. 2003) ..................................................15

*Espinal-Dominguez v. Com. of Puerto Rico*, 352 F.3d 490 (1st Cir. 2003)............13

*Evans v. Mayer Tree Serv., Inc.*, 162 N.E.3d 70 (Mass. Ct. App. 2020)................26

*Evans v. United States*, 876 F.3d 375 (1st Cir. 2017)..............................................26

*Faiella v. Fed. Nat'l Mortg. Ass'n,* 928 F.3d 141 (1st Cir. 2019)...........................29

*Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1 (1987)...................................37

*Hilbert v. Aeroquip, Inc.*, 486 F. Supp. 2d 135 (D. Mass. 2007) ...........................27

*Hillsborough Cnty, Fla v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985)........41

*Houston Cmty. Hosp. v. Blue Cross & Blue Shield of Tex., Inc.*, 481 F.3d 265 (5th Cir. 2007)................................................................................................................14

*In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326 (4th Cir. 2014)...............................30

*In re Sealed Case No. 99-3091*, 192 F.3d 995 (D.C. Cir. 1999) ............................13

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42 (D.C. Cir. 2019)................................................................................................................24

*In re World Trade Center Disaster Site Litigation*, 521 F.3d 169 (2d Cir. 2008)......16

*Ivanov v. Sunset Pools Management, Inc.*, 567 F.Supp.2d 189 (D.D.C. 2008) ......50

*Jackson v. Brigle*, 17 F.3d 280 (9th Cir. 1994) ......................................................15

*Knitter v. Corvias Mil. Living, LLC*, 758 F.3d 1214 (10th Cir. 2014) ...................51

*Kudlacz v. Cultural Care, Inc.,* Case No. CGC-20-584567 (Cal. Sup. Ct. Sept. 3, 2020)....................................................................................................... 30, 38, 47

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ...........................................33

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) .....................................................19

*Lopez v. Massachusetts,* 588 F.3d 69 (1st Cir. 2009) ...................................... 18, 21

*Lutz v. Sec'y of Air Force*, 944 F.2d 1477 (9th Cir. 1991) .....................................15

*Maccabees Mut. Life Ins. Co. v. Perez-Rosado*, 641 F.2d 45 (1st Cir. 1981) ........42

*Martin v. Halliburton*, 618 F.3d 476 (5th Cir. 2010) .............................................14

*Mathis v. Henderson*, 243 F.3d 446 (8th Cir. 2001)...............................................19

*McMahon v. Presidential Airways, Inc.,* 502 F.3d (11th Cir. 2007) ............... 15, 20

*Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996) ........................................................37

*Morris-Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153 (2d Cir. 2005)................................................................................................................20

*New York State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405 (1973)...................39

*Newton v. Lee*, 677 F.3d 1017 (10th Cir. 2012) ....................................................15

*Nieves-Marquez v. Puerto Rico*, 353 F.3d 108 (1st Cir. 2003) ..............................18

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015)....................................................43

*Padron v. GreatAuPair, LLC*, Case No. CGC-20-587057 (Cal. Sup. Ct. Feb. 16, 2021)....................................................................................................................38

*Pullman Const. Indus., Inc. v. United States*, 23 F.3d 1166 (7th Cir. 1994)...........13

*Regan v. Starcraft Marine*, LLC, 524 F.3d 627 (5th Cir. 2008) ............................15

*State of Alaska v. United States*, 64 F.3d 1352 (9th Cir. 1995)...............................13

*Swint v. Chambers County Commission,* 514 U.S. 35 (1995) ..................................18

*Taylor Energy Co., L.L.C. v. Luttrell*, 3 F.4th 172 (5th Cir. 2021) ........................24

*United States v. Flemmi*, 225 F.3d 78 (1st Cir. 2000) ..................................... 23, 27

*United States v. Marino*, 200 F.3d 6 (1st Cir. 1999) ...............................................18

*United Transp. Union Loc. 1745 v. City of Albuquerque*, 178 F.3d 1109 (10th Cir. 1999)....................................................................................................................22

*Villanueva v. United States*, 662 F.3d 124 (1st Cir. 2011) ......................................13

*Will v. Hallock*, 546 U.S. 345 (2006) .....................................................................16

*Wyeth v. Levine*, 555 U.S. 555 (2009) ............................................................. 34, 37

*Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940)............................... 23, 24, 27

*Zych v. Unidentified Wrecked & Abandoned Vessel, Believed to be the Seabird*, 19 F.3d 1136 (7th Cir. 1994)....................................................................................19

## Statutes

21 U.S.C. § 360bbb-3................................................................................................27

22 U.S.C. § 2451 ......................................................................................................45

29 U.S.C.  § 201, *et seq.*................................................................... 2, 21, 32, 42

42 U.S.C. § 5148.......................................................................................................16

8 U.S.C. § 1101 .........................................................................................................33

Pub. L. No. 104-72, 109 Stat. 776 (1995).......................................................... 33, 36

Pub. L. No. 105-48, 111 Stat. 1165 (1997)......................................................... 33, 36

**Other Authorities**

Brief for the United States as Amicus Curiae Supporting Petitioners, Al *Shimari v. CACI Premier Tech., Inc.,* No. 19-648 (U.S. AUG. 26, 2020) ...................... 12, 14

H.R. 2767, To Extend Au Pair Programs: Markup Before the Subcomm. On Int'l Operations and Human Rights of the Comm. On Int'l Relations H.R., 104 Cong. (1995) .............................................................................................................. 36

Restatement (Third) Of Agency § 1.01 (2006) ......................................................... 26

**Regulations**

10 C.F.R. § 26.53 ..................................................................................................... 27

22 C.F.R. § 62.1 ......................................................................................................... 6

22 C.F.R. § 62.10 ............................................................................................ 7, 8, 46

22 C.F.R. § 62.11 .......................................................................................... 7, 28, 44

22 C.F.R. § 62.13 ......................................................................................................... 9

22 C.F.R. § 62.2 ............................................................................................. 6, 27, 31

22 C.F.R. § 62.3 ....................................................................................................... 31

22 C.F.R. § 62.31 ............................................................................................... passim

22 C.F.R. § 62.40 ..................................................................................................... 49

22 C.F.R. § 62.9 ................................................................................................. passim

29 C.F.R. § 62.14 ..................................................................................................... 50

32 C.F.R. § 761.8 ..................................................................................................... 27

Exchange Visitor Program, 60 FR 8547-02, 60 Fed. Reg. 8547-53 (Feb. 15, 1995) ............................................................................................................. 34, 36

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument is appropriate given the number and complexity of issues.

## INTRODUCTION

Cultural Care asserts that it is not bound by state consumer and minimum wage protections covering thousands of childcare workers it brings into the United States each year on J-1 au pair visas.

This is not Cultural Care's first attempt to avoid state minimum wage laws. Courts around the country, including this Court, have repeatedly and unanimously concluded that childcare workers on J-1 au pair visas are not exempted from state minimum wage protections because of the visa they work under. *See generally Capron v. Off. of Att'y Gen. of Massachusetts*, 944 F.3d 9 (1st Cir. 2019); *see also infra* at Appellant's Add. at 20 (District Court Order citing cases). And, while no court has addressed the application of state consumer protection claims like those alleged here to Cultural Care's conduct, Plaintiffs' consumer protection claims are even less likely foreclosed by the doctrines of derivative sovereign immunity and preemption than their state minimum wage claims.

This appeal, however, reflects Cultural Care's newest and most novel tack to evade state law. It argues that even if state minimum wage laws apply to childcare workers on J-1 au pair visas, Cultural Care is immune from those laws under the doctrine of derivative sovereign immunity. In denying Cultural Care's motion to dismiss, the District Court concluded that Cultural Care is just like any other private entity operating in a heavily regulated field; the federal government's regulations

1

cannot and do not cloak Cultural Care in the federal government's immunity from liability under state law. *See* Appellant's Add. at 12-13. The District Court also rejected Cultural Care's argument that its obligations under state minimum wage laws are preempted by federal au pair regulations. *Id.* at 13-18. Finally, the District Court concluded that Plaintiffs had adequately pled that Cultural Care is an employer under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.,* ("FLSA"), *id.* at 18-20.

Before Plaintiffs were able to obtain discovery and even while hundreds of childcare workers were joining the case as FLSA opt-in plaintiffs under 29 U.S.C. § 216(b), Cultural Care filed an interlocutory appeal with this Court, effecting a stay of all litigation below.

As an initial matter, this Court lacks jurisdiction to hear this appeal. Cultural Care latches onto the denial of derivative sovereign immunity to attempt an immediate appeal on that issue under the collateral order doctrine. It then attempts to bootstrap jurisdiction over its preemption and FLSA employer arguments through pendent appellate jurisdiction. This attempt to short circuit the final judgment rule and get another bite at the apple on the motion to dismiss through an interlocutory appeal conflicts with both the collateral order doctrine and this Court's case law regarding its pendent appellate jurisdiction.

If the Court were to conclude that it has jurisdiction, Cultural Care's

arguments on the merits also fail. Cultural Care is a private corporation profiting off the labor of foreign childcare workers. It has no contract with the federal government, and the government's regulations make clear both that Cultural Care does not act as an agent of the State Department and that Cultural Care is bound to follow state law. Furthermore, Plaintiffs plead that Cultural Care exercises substantially more control over J-1 visa au pairs than federal regulations require. Cultural Care can benefit from the federal government's sovereign immunity to avoid liability no more than any other private entity performing a function that the government could (in theory) perform itself, but which it instead has left to the private market.

If the Court concludes that it has jurisdiction not only over Cultural Care's derivative sovereign immunity argument but also over its preemption and FLSA employer arguments, it should affirm the District Court's order on those issues too.

Respecting preemption, this Court's opinion in *Capron* is dispositive. There is no basis in "the text, . . . [the] regulatory history, [or] past practice," *Capron*, 944 F.3d at 44, to conclude the State Department intended *not* to preempt state minimum wage requirements as applicable to host families but *did* intend to preempt those laws as applicable to sponsor agencies.

With respect to Cultural Care's FLSA employer argument, Cultural Care attempts the same tired argument that failed below and in other state and federal trial

courts: that mere compliance with State Department regulations cannot support a finding of FLSA employer status. Plaintiffs alleged, however, and the District Court recognized, that Cultural Care does much more than simply follow the regulations. Appellant's Add. at 18-20 (citing concurring state and federal trial courts). It creates contractual rights and obligations that control au pairs in ways nowhere contemplated by the au pair regulations.

## JURISDICTIONAL STATEMENT: THIS COURT LACKS JURISDICTION TO CONSIDER THIS APPEAL

This Court lacks collateral order doctrine jurisdiction to consider Cultural Care's claim of derivative sovereign immunity and lacks pendent appellate jurisdiction to consider Cultural Care's arguments regarding preemption and Fair Labor Standards Act employer status.

## STATEMENT OF THE CASE

### A.     Procedural Background

On February 19, 2021, Plaintiffs filed their Second Amended Class Action Complaint against Appellant Cultural Care for its failure to pay minimum and overtime wages in violation of the Fair Labor Standards Act, its violation of relevant stage wage and hours laws, and its violations of consumer protection laws based on its misrepresentations to host families and childcare workers regarding host families' obligations to follow state minimum wage laws as recognized by this Court in *Capron*. App. at 15-56 ("Compl."). On March 22, 2021, Cultural Care filed a Motion

4

to Dismiss the Second Amended Complaint. App. at 7.

On August 13, 2021, the District Court issued an Order, granting in part and denying in part Defendant's Motion. Appellant's Add. at 1-22 ("Order"). As relevant here, the District Court concluded that (1) Cultural Care could not assert derivative sovereign immunity to avoid liability under state minimum wage laws, Order at 12-13; (2) Plaintiffs' state law claims against Cultural Care were not preempted, Order at 13-18; and (3) Plaintiffs plausibly pled that Cultural Care was their employer under the FLSA, Order at 18-20.

Cultural Care filed a Notice of Appeal with respect to the Order and in subsequent briefing has asserted that this Court has appellate jurisdiction over this interlocutory appeal based on the collateral order doctrine and pendent appellate jurisdiction. *See* Appellant's Br. at 4.

**B.    Factual Allegations Relevant to This Appeal**

Cultural Care, a Massachusetts corporation, operates throughout the United States as an employer of in-home childcare workers who work in the United States on J-1 au pair visas. Compl. ¶¶ 2, 3, 12, 13. Plaintiffs Karen Morales Posada, Amanda Sarmento Ferreira Guimaraes, Williana Rocha, and Sara Barrientos, along with those similarly situated, worked for Cultural Care in California, New York, New Jersey, and Illinois. *Id.* ¶¶ 7-10. Cultural Care employs at least 10% of all childcare workers working on J-1 au pair visas in these states. *Id.* ¶13. Cultural Care's

5

childcare workers typically work for at least 40 hours per week for 50 weeks per year. *Id.* ¶14. Cultural Care's business model is premised on attracting host families who pay thousands of dollars in fees in exchange for access to the childcare workers vetted, selected, trained, and supervised in part by Cultural Care. *Id.* ¶ 3. Cultural Care receives approximately $9,570.00 in fees from host families for each childcare worker it matches with a host family. *Id.* ¶ 17. It entices host families to choose Cultural Care as their agency with the promise of affordable childcare—instructing them to pay the au pairs a weekly "stipend" of only $195.75. *Id.* ¶ 17. In doing so it violates state and federal wage laws and deceives families in violation of consumer protection laws. *Id.* ¶¶ 16-17.

The State Department, by regulation, created the Exchange Visitor Program to promote educational and cultural exchanges between the people of the United States and of other nations. 22 C.F.R. § 62.1(a). The State Department does not carry out Exchange Visitor Programs itself, but rather "facilities activities. . .by designating public and private entities to act as sponsors of the Exchange Visitor Program." 22 C.F.R. § 62.1(b). A sponsor is a legal entity designated to "conduct an exchange visitor program." 22 C.F.R. § 62.2. A "designation" is a "written authorization issued by the Department of State to an exchange visitor program applicant to conduct an exchange visitor program as a sponsor." *Id.* Nothing in that authorization immunizes Cultural Care from state laws. In fact, as a sponsor, Cultural Care "must remain in

6

compliance with all local, state, and federal laws, and professional requirements necessary to carry out the activities for which it is designated" 22 C.F.R. § 62.9. For exchange programs like the au pair program, sponsor agencies must designate Responsible Officers with a "detailed knowledge of federal, state, and local laws pertaining to employment . . .." 22 C.F.R. § 62.11

Cultural Care's conduct relating to the selection, training, job duties, and termination of au pairs go far beyond the minimum obligations required by State Department regulations.

Selection. State Department regulations governing all exchange visitor programs require that sponsors "establish and utilize a method to screen and select prospective exchange visitors to ensure that they are eligible for program participation." 22 C.F.R. § 62.10(a). State Department regulations specific to au pairs establish age, English language, education, physical, personality and background investigation requirements. *See* 22 C.F.R. § 62.31(d). Cultural Care exercises much broader discretion in its selection process—retaining the right to reject an au pair application for any reason it deems advisable, not solely for failure to meet State Department eligibility requirements. Compl. ¶ 25.

Similarly, State Department regulations require that host families are U.S. Citizens, fluent in English, able to pass a background investigation, able to bear the financial cost, and able to provide a suitable private bedroom. *See* 22 C.F.R. §§ 62.31

7

(e), (h). Cultural does much more than that. It "retains the exclusive right to determine that the host family's environment is not suitable and to terminate the host family from the program." Compl. ¶ 24(c). Cultural Care further requires the host family inform it of any "change in the composition of the family" despite no regulatory requirement to do so. *Id.* ¶ 24(c).

Training. State Department regulations governing all exchange programs require orientation on life and customs in the U.S., local community resources, and a description of the exchange visitor program. 22 C.F.R. § 62.10(c). The au pair specific regulations require sponsors provide "eight hours of child safety instruction . . . [and] not less than twenty-four hours of child development instruction." 22 C.F.R. § 62.31(g). The regulations do not dictate the specific content of the training; that is left to the sponsor agency's discretion. *See id.* Cultural Care requires its au pairs to attend four days of in-person training in Tarrytown, New York. Compl. ¶ 29. The training is uncompensated. *Id.* at 30.

Duties. State Department regulations state that "all au pair participants provide child care services." 22 C.F.R. § 62.31(a). The regulations governing all exchange programs require sponsors "ensure that the activities in which exchange visitors are engaged are consistent with the category and activity listed on their Forms DS–2019." 22 C.F.R. § 61.10(d)(1). The regulations also impose certain placement restrictions, such not allowing an au pair to be placed with a family having

a child "aged less than three months unless a parent or other responsible adult is present in the home" or "with a host family having children under the age of two, unless the au pair has at least 200 hours of documented infant childcare experience." 22 C.F.R. 62.31(e).

Cultural Care implements these restrictions. Compl. 24 ¶ (a). But Cultural Care exerts further control over the working conditions of au pairs and communicates with them regarding the performance of their job duties. *Id.* ¶¶ 22, 24. Cultural Care permits au pairs to perform "light housework relating to childcare services" but prohibits them from performing "general housekeeping or heavy chores." *Id.* ¶ 24(f).

<u>Right to Terminate.</u> State Department regulations contain certain reporting requirements, but do not give sponsors the right to terminate an au pair. The regulations pertaining to all exchange visitor programs require sponsors "to promptly report in SEVIS the involuntary termination of an exchange visitor's program." 22 C.F.R. § 62.13(a)(5). "[S]uch notification in SEVIS ends a sponsor's programmatic obligations to the exchange visitor." *Id.* Regulations also contain certain reporting requirements, including reporting any "unusual or serious situations or incidents involving either the au pair or host family," any incidents involving a crime of moral turpitude or violence, and the substance and resolution of any complaints by host families or au pairs. *Id.* § 62.31 (l), (m).

9

Beyond these reporting requirements, Plaintiffs plead that Cultural Care "vests [itself] with the right to determine, in its sole judgment, if the au pair is unable to perform her duties for an extended period of time—in which case Cultural Care will send the au pair home and end her assignment." Compl. ¶ 24(j). Plaintiffs further plead that Cultural Care "retains the right to end any au pair's employment if the au pair engages in conduct that Cultural Care believes is not in the best interest of the program." *Id.* at 26. Cultural Care's control over termination therefore extends beyond the mere reporting requirements of the regulations.

The regulations contemplate the need for rematches, requiring sponsors to provide "a summation of all situations which resulted in the placement of au pair participant with more than one host family." 22 C.F.R. § 62.31(m)(3). However, there is no regulation governing the process for an au pair to rematch with a different host family. Rather, these obligations are contractual in nature. As Plaintiffs pled, Cultural Care "maintains the right to . . . reassign au pairs" and "to mediate disputes between au pairs and host families." Compl. ¶ 24.

<u>Wages.</u> The regulations require that au pairs are "compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act." 22 C.F.R. § 62.31(j)(1). The regulations do not, however, set a required amount for the stipend, nor do they set an upper limit for the stipend. *See id.* Cultural Care instructs host families to pay au

10

pairs a minimum stipend of $195.75 per week. Compl. ¶ 17. It also tells au pairs that they will receive a $195.75 weekly stipend. *Id.* ¶ 23. Cultural Care advises host families that there is different pricing in Massachusetts, instructing host families in Massachusetts to pay minimum wage and overtime consistent with Massachusetts' state law. *Id.* ¶ 20. Cultural Care's website explains that host families in Massachusetts must pay "the MA minimum wage (12.75/hour in 2020) times the number of hours the au pair is on duty for the week up to 40." *Id.* It further explains that host families in Massachusetts must pay overtime premiums, stating "[i]f the au pair works between 41-45 hours during a week, you must pay time-and-a half for the hours worked over the 40 hours limit." *Id.* The undisputed record shows that it was Cultural Care, not the State Department, that instructed host families to pay a weekly stipend of $195.75.

Cultural Care's specific disclosures regarding Massachusetts state law highlight its deceptive trade practices. Cultural Care deceives its childcare workers and host families by claiming families may pay their J-1 visa au pairs $195.75 per week for up to 45 hours of work in New York, California, New Jersey, and Illinois. Compl. ¶ 16. Cultural Care's pricing for these states says nothing about the applicability of state law. *Id.* ¶ 21. Instead, the website states:

**Minimum au pair stipend payments**
This calculation is based on a weekly stipend of at least $195.75[1] paid to your au pair for 51 weeks, including 2 weeks of paid vacation.

*Id.* Juxtaposed against Cultural Care's specific instructions about the applicability of Massachusetts state law, *id.* ¶ 20, this instruction deceptively suggests that the state minimum wage laws of New York, California, New Jersey, and Illinois are inapplicable to au pairs.

## SUMMARY OF THE ARGUMENT

***First***, this Court does not have jurisdiction to hear this interlocutory appeal. The Court should side with all the appellate courts to have addressed the issue directly and with the United States Government's stated position and conclude that there is no collateral order doctrine jurisdiction over appeals from denials of derivative sovereign immunity. To the extent that Cultural Care enjoys derivative sovereign immunity from some of the claims raised in this case, that immunity is a defense to liability, it is not an immunity from suit. Cultural Care's interests can adequately be protected through appeal after final judgment.

***Second***, even if the Court has jurisdiction to hear Cultural Care's derivative sovereign immunity arguments, it does not have jurisdiction to decide Cultural Care's preemption and FLSA employer arguments. Pendent jurisdiction is rarely appropriate. It is inappropriate in this case where neither Cultural Care's preemption nor FLSA employer arguments meaningfully overlap with its derivative sovereign immunity argument. Cultural Care does not even assert derivative sovereign immunity against Plaintiffs' FLSA claims.

12

*Third*, if the Court were to decide that there is collateral order jurisdiction to hear Cultural Care's derivative sovereign immunity argument, it should affirm the District Court's decision on that matter. Cultural Care is not able to point to a single case where a defendant was able to assert derivative sovereign immunity without having a contractual arrangement of some form with the federal government. That makes sense. It is doubtful that the federal government could ever clearly manifest its assent to an agency relationship without a contract between it and its agent. Even if an agency relationship sufficient to establish derivative sovereign immunity could exist in the absence of a contractual relationship, it does not exist here. The State Department regulations say merely that it may "designat[e]" sponsors. 22 C.F.R. § 62.2. Those same regulations also prohibit sponsors from representing that they "are endorsed, sponsored, or supported" by the United States Government. *Id.* § 62.9(d)(5).

*Fourth*, even if Cultural Care could in theory obtain derivative sovereign immunity via the au pair regulations, this Court should at most remand to the District Court for further factual development on this issue. Cultural Care cannot establish as a matter of law at this stage that it did not exceed the authority purportedly conferred on it by the federal government.

*Fifth*, if the Court reaches Cultural Care's preemption arguments, it should affirm the District Court's decision on that issue too. Cultural Care makes no

plausible argument that Plaintiffs' consumer protection claims are preempted when those claims turn on Cultural Care's alleged misrepresentations regarding host families' responsibility to pay minimum wage pursuant to this Court's decision in *Capron*. Respecting Plaintiffs' wage and hour claims, there is no suggestion in Congress's delegation to the State Department that Congress conferred on the State Department the authority to preempt state minimum wage laws. In fact, explicit legislative history suggests Congress never intended the State Department to have that power. To the extent the State Department has the authority to preempt state minimum wage laws, there is no indication that it intended to preempt sponsors' minimum wage obligations even though, as this Court held in *Capron*, it did not have such an intention with respect to host families' obligations.

*Sixth*, if it reaches the issue, the Court should also affirm the District Court's conclusion that Plaintiffs plausibly pled Cultural Care was an employer under the FLSA. Plaintiffs plead that Cultural Care exercises substantially more control over au pairs than required by au pair regulations.

## ARGUMENT

### C.    This Court Lacks Jurisdiction to Hear This Appeal

#### 1.    This Court Does Not Have Collateral Order Doctrine Jurisdiction to Consider Cultural Care's Derivative Sovereign Immunity Argument

The United States Government agrees with Plaintiffs that there is no collateral order doctrine jurisdiction for district court denials of derivative sovereign immunity

because derivative sovereign immunity is a defense to liability, not immunity from suit. *See* Brief for the United States as Amicus Curiae Supporting Petitioners, Al *Shimari v. CACI Premier Tech., Inc.,* No. 19-648 (U.S. AUG. 26, 2020) ("DOJ Amicus Br.").[1] The United States' position is consistent with First Circuit law: A defense to liability is not a shield to judicial process, and denials of such defenses may not be appealed on an interlocutory basis under the collateral order doctrine. *See Espinal-Dominguez v. Com. of Puerto Rico*, 352 F.3d 490, 497 (1st Cir. 2003).

Cultural Care argues that its purported derivative sovereign immunity immunizes it from suit entirely. This is incorrect. Even if the federal government's sovereign immunity is an immunity from suit and not merely a defense to liability,[2]

---

[1] In response to a *certiorari* petition filed by the defendants in *Al Shimari v. CACI Premier Tech., Inc.,* the United States Supreme Court invited the United States government to submit an amicus brief on whether a denial of derivative sovereign immunity is subject to immediate appeal under the collateral order doctrine. 775 F. App'x 758, 759–60 (4th Cir. 2019), cert. denied, No. 19-648, 2021 WL 2637838 (U.S. June 28, 2021). The Supreme Court subsequently denied *certiorari. See id.* Plaintiffs include portions of the amicus brief in their addendum, *see* Appellees' Add. at 1-13, and the complete amicus brief is available here: https://www.supremecourt.gov/DocketPDF/19/19-648/151310/20200826130104385_CACI%20v%20Al-Shimari.pdf.

[2] *Compare State of Alaska v. United States*, 64 F.3d 1352, 1355 (9th Cir. 1995), *and Pullman Const. Indus., Inc. v. United States*, 23 F.3d 1166, 1169 (7th Cir. 1994), *with In re Sealed Case No. 99-3091*, 192 F.3d 995, 1000 (D.C. Cir. 1999). While the First Circuit has described federal sovereign immunity as "immunity from suit," *Villanueva v. United States*, 662 F.3d 124, 126 (1st Cir. 2011), it has not analyzed the issue in the context of addressing this Court's appellate jurisdiction. For the reasons described here, this Court need not resolve the issue in order to conclude that it does not have appellate jurisdiction over the District Court's denial

the derivative immunity of federal contractors is distinct and substantially narrower than the federal sovereign immunity. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016) (There is "no authority for the notion that private persons performing Government work acquire the Government's embracive [sovereign] immunity."). Derivative sovereign immunity flows from the authority the federal government may "delegate to its agents. . . to take certain actions that would be unlawful if committed by others." Appellees' Add. at 11 (DOJ Amicus at Br.). The defense does not apply, however, when the defendant acts outside of the scope of its delegated authority. *Campbell-Ewald Co.*, 577 U.S. at 166. And because addressing whether a defendant acted within the scope of its legal authority will often be "coterminous with the merits of the action," it makes little sense to consider the doctrine as providing immunity from suits to assess the merits of the action. Appellees' Add. at 12 (DOJ Amicus Br.). Derivative sovereign immunity is thus not an immunity from suit, but rather a defense to liability.

The only circuit court decisions addressing appellate jurisdiction of denials of derivative sovereign immunity are aligned with the Plaintiffs' and the United States' position. *See Al Shimari v. CACI Premier Tech., Inc.,* 775 F. App'x 758, 759–60 (4th Cir. 2019), cert. denied, No. 19-648, 2021 WL 2637838 (U.S. June 28, 2021); *Martin*

---

of Cultural Care's derivative sovereign immunity.

*v. Halliburton*, 618 F.3d 476, 485 (5th Cir. 2010); *Houston Cmty. Hosp. v. Blue Cross & Blue Shield of Tex., Inc.*, 481 F.3d 265, 276–81 (5th Cir. 2007).

Cultural Care contrives a circuit split by pointing to cases involving collateral order doctrine appeals related to different types of immunity.[3] *See* Appellant's Br. at 22-25 (citing cases involving sovereign immunity, foreign sovereign immunity, qualified immunity, absolute immunity, foreign attachment immunity, derivative Stafford Act immunity, and *Feres* immunity). But these cases address immunity doctrines that provide immunity from suit and are therefore inapposite. In fact, the policy interests underlying the immunity doctrines discussed in those cases reinforce why the collateral order doctrine does not apply in this case.

*McMahon v. Presidential Airways, Inc.,* 502 F.3d 1331 (11th Cir. 2007), considers whether the collateral order doctrine applies to *Feres* immunity, which bars servicemembers from "recover[ing] for their service-related injuries in tort suits against the government." *See* 502 F.3d at 1341. *McMahon* points to interests specific to the *Feres* doctrine that do not apply in derivative sovereign immunity contexts—

---

[3] Cultural Care also cites to *Cunningham v. Gen. Dynamics Info. Tech., Inc*., 888 F.3d 640 (4th Cir. 2018). But that case involved a typical appeal from final judgment based on a Rule 12(b)(6) dismissal, not the appeal of a collateral order. *Id.* And while that court did find derivative sovereign immunity to be jurisdictional rather than a mere defense to liability, *id.* at 649-51, when the Fourth Circuit squarely addressed the appellate jurisdiction issue at stake here, it concluded that there was no collateral order doctrine jurisdiction over an appeal from a denial of derivative sovereign immunity. *See Al Shimari,* 775 F. App'x at 759–60.

17

"the need to avoid judicial interference with military discipline and sensitive military judgments"—to conclude that the *Feres* immunity, unlike derivative sovereign immunity, is an immunity from suit. *Id.* at 1340; *see also Newton v. Lee*, 677 F.3d 1017, 1022-23 (10th Cir. 2012); *Dibble v. Fenimore*, 339 F.3d 120, 122-25 (2d Cir. 2003); *Regan v. Starcraft Marine*, LLC, 524 F.3d 627, 630-33 (5th Cir. 2008); *Jackson v. Brigle*, 17 F.3d 280, 281-82 (9th Cir. 1994); *Lutz v. Sec'y of Air Force*, 944 F.2d 1477, 1479 (9th Cir. 1991).

*In re World Trade Center Disaster Site Litigation*, 521 F.3d 169 (2d Cir. 2008), is also distinguishable. There, the Second Circuit addressed whether the collateral order doctrine applies to a derivative assertion of Stafford Act immunity—immunity for the "exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of a Federal agency or an employee of the Federal Government" providing disaster relief. *See* 42 U.S.C. § 5148; *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d at 187. Stafford Act immunity is a form of "discretionary function immunity" protecting activities that "involve an element of judgment or choice" that are "grounded in considerations of public policy." *See In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d at 195.

Policy interests underpinning "discretionary function immunity," according to the Second Circuit, suggest it is an immunity from suit entirely. As the Second Circuit explained:

18

> The discretionary function immunity in the Stafford Act … is obviously animated by separation of powers concerns. Section 305 of the Stafford Act protects a right—the right of federal agencies to make discretionary decisions when engaged in disaster relief efforts without fear of judicial second-guessing—that is a "particular value of a high order." Denying immediate review of the denial of such an immunity could well result in "a trial that would imperil a substantial public interest."

*Id.* at 192 (quoting *Will v. Hallock*, 546 U.S. 345, 352-53 (2006)).

Cultural Care's purported derivative sovereign immunity involves entirely distinct interests. In this case, there is no reason that a trial regarding Cultural Care's obligations under state law would "imperil a substantial public interest." Such a trial would not expose sensitive military information or involve second guessing discretionary decisions that must not be second guessed. Rather, in this case, to the extent Cultural Care is protected against liability for alleged violations of laws, its interests can be adequately protected through an appeal after final judgment.

This Court should follow the reasoning of the United States, which is consistent with this Circuit's prior precedent and with the Fourth and Fifth Circuits and conclude there is no appellate jurisdiction over Cultural Care's appeal from the District Court's rejection of its derivative sovereign immunity argument.

2.    <u>There Is No Pendent Appellate Jurisdiction to Consider the Remaining Issues</u>

Even if this Court were to conclude that there is appellate jurisdiction to consider Cultural Care's assertion of derivative sovereign immunity under the collateral order doctrine, the Court would have jurisdiction only over the derivative

19

sovereign immunity question at issue here. Appellant's Br. 21-25. But Cultural Care does not stop at derivative sovereign immunity. Instead, it urges this Court to consider most of the remaining issues raised in its motion to dismiss below—and even issues it did not raise—based on its assertion of pendent appellate jurisdiction. *See* Appellant Br. at 34-35, 48-49. This Court does not have pendent appellate jurisdiction over those matters.

As this Circuit and the Supreme Court have observed, "'a rule loosely allowing pendant appellate jurisdiction would encourage parties to parlay . . . collateral orders into multi-issue interlocutory appeal tickets.'" *United States v. Marino*, 200 F.3d 6, 12 (1st Cir. 1999) (quoting *Swint v. Chambers County Commission*, 514 U.S. 35, 49-50 (1995)). The Supreme Court and this Court have thus placed "severe constraints" on pendent appellate jurisdiction. *Id.* "Instances in which the exercise of pendent appellate jurisdiction is appropriate are hen's-teeth rare." *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 44 (1st Cir. 2010) (internal quotation marks omitted).

In urging this Court to exercise pendent appellate jurisdiction over its preemption and FLSA employer arguments, Cultural Care invokes a line of cases involving Eleventh Amendment immunity. *See* Appellant Br. at 48-49. But appeals from denials of Eleventh Amendment immunity are distinct. In that context, this Court has exercised broader pendent appellate jurisdiction to dispose of cases on

20

merits issues, without having to address constitutional Eleventh Amendment questions. *Lopez v. Massachusetts,* 588 F.3d 69, 82-83 (1st Cir. 2009) ("The doctrine of constitutional avoidance presents an especially strong justification for exercising pendent appellate jurisdiction…."); *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 124 (1st Cir. 2003) ("assertion of such jurisdiction is in keeping with the rule that courts should avoid deciding constitutional issues if non-constitutional grounds are available"). Constitutional avoidance concerns present in Eleventh Amendment immunity cases are not present here, however. Unlike state sovereign immunity, federal sovereign immunity and derivative sovereign immunity are rooted in the common law, not in the Constitution. *See, e.g.*, *Zych v. Unidentified Wrecked & Abandoned Vessel, Believed to be the Seabird*, 19 F.3d 1136, 1142 (7th Cir. 1994) ("Federal sovereign immunity is a common law doctrine that simply holds that the federal government cannot be sued without its consent. State sovereign immunity is a constitutional doctrine which rests on principles of federalism." (internal quotation marks and emphasis omitted)).

Here, the Court should apply the traditionally strict standard to decide whether there is pendent jurisdiction over the preemption and FLSA employer questions. In this Court, "at a bare minimum, a party promoting the exercise of pendent appellate jurisdiction [must] demonstrate either that the pendent issue is inextricably intertwined with the issue conferring the right of appeal or that review of the pendent

issue is essential to ensure meaningful review of the linchpin issue." *See Limone v. Condon*, 372 F.3d 39, 51 (1st Cir. 2004).

Cultural Care cites to *Mathis v. Henderson*, 243 F.3d 446 (8th Cir. 2001), to suggest that the preemption and derivative sovereign immunity issues are intertwined because deciding the preemption issue in Cultural Care's favor will have the same effect as deciding the sovereign immunity issue in Cultural Care's favor. Appellant Br. at 34.

This is not the law. The question is whether the preemption and derivative sovereign immunity inquiries substantially overlap. *See Morris-Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 163 (2d Cir. 2005) (to be "intertwined" there must be "sufficient overlap in the factors relevant to the appealable and nonappealable issues"); *United Transp. Union Loc. 1745 v. City of Albuquerque*, 178 F.3d 1109, 1114 (10th Cir. 1999) ("We have further interpreted "inextricably intertwined" to include only situations where "the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal-that is, where the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well." (internal quotation marks omitted)).

Applying this standard, appellate courts addressing the issue in similar contexts typically conclude that they do not have pendent appellate jurisdiction over preemption arguments even when they have collateral order doctrine jurisdiction

over related sovereign immunity issues. *Al-Quraishi v. L-3 Servs., Inc.*, 657 F.3d 201, 215 (4th Cir. 2011) ("Preemption is not 'inextricably intertwined with' the question of L–3's immunity under the laws of war because those inquiries are wholly distinct."); *McMahon*, 502 F.3d at 1366 ("We have considerable doubt that this theory [*i.e.*, preemption of a state law tort claim] is inextricably intertwined with the arguable claim of derivative *Feres* immunity upon which our appellate jurisdiction is based.").

Even if they can be intertwined in some circumstances, however, the preemption and derivative sovereign immunity inquiries are not intertwined here. The derivative sovereign immunity analysis looks at whether Cultural Care acts as a contractor or agent of the federal government and whether it acts within the scope of that agency. The preemption analysis examines whether Congress and the State Department intended to preempt Cultural Care's obligations under state minimum wage laws.

It is also hard to see how the issue of derivative sovereign immunity is inextricably intertwined with Cultural Care's arguments about its status as an FLSA employer. Derivative sovereign immunity is not even a defense to FLSA liability. Appellant's Add. at 13 n.4 (District Court applying the FLSA's penalties to provision to any "employer"), § 203(d) (defining "employer" to include public agencies)), and Cultural Care expressly did not assert derivative sovereign immunity

23

to Plaintiffs' FLSA claims. *See* Appellant's Br. at 21 ("Derivative Sovereign Immunity Bars *The State Law Claims*" (emphasis added)).

The *Lopez* case cited by Cultural Care in support of pendent appellate jurisdiction over the FLSA employer issue is also inapposite. *See* Appellant Br. at 48-49 (citing *Lopez*, 588 F.3d 69). In *Lopez*, the question was whether the state was entitled to Eleventh Amendment immunity against a Title VII claim. The Court instead considered whether the defendant was an "employer" under Title VII because that issue was "determinative," *i.e.*, it disposed of the case entirely, and by resolving that issue the Court could avoid a constitutional question about the scope of Eleventh Amendment immunity. *Id.* at 82-83. As explained above, whether Cultural Care is derivatively immune is not a constitutional question, and in any event, addressing Cultural Care's employer status under the FLSA would not be determinative because it would not dispose of Plaintiffs' state law claims.

Finally, "[t]he exercise of pendent appellate jurisdiction is discretionary." *United Transp. Union Loc. 1745 v. City of Albuquerque*, 178 F.3d 1109, 1114 (10th Cir. 1999). Because of the number and complexity of issues implicated by Cultural Care's preemption and FLSA employer arguments—issues that will benefit from further factual development below—even if Cultural Care's pendent jurisdiction arguments raise a close call, the Court should exercise its discretion to decline such jurisdiction.

24

**D.    Cultural Care Is Not Entitled to Derivative Sovereign Immunity with Respect to the State Law Claims**

1.    Because It Is Not a Contractor or Agent of the Federal Government, Cultural Care is Not Protected by Derivative Sovereign Immunity

Cultural Care asserts derivative sovereign immunity for both Plaintiffs' state minimum wage claims and state consumer protection claims. Even if the Court has jurisdiction to consider the issue, it should reject Cultural Care's arguments. Cultural Care can point to no contract with the federal government to support its claim to immunity, and it does not identify any federal regulation creating an agency relationship between the federal government and Cultural Care, particularly in light the high bar for establishing such a relationship, *United States v. Flemmi*, 225 F.3d 78, 85 (1st Cir. 2000) (agency with federal government can only be conveyed by actual authority expressed "in clear and unequivocal terms.").

The Supreme Court has explained that derivative sovereign immunity is available to "[g]overnment contractors . . . [seeking] immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald*, 577 U.S. at 166 (citations and quotations omitted). Cases involving assertions of derivative sovereign immunity typically turn on whether a federal contractor performed work pursuant to "the Government's explicit instructions," *id.*, or whether a contractor "exceeded his authority" under a contract. *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 21 (1940). But before considering

25

whether a government contractor acted within the scope of its delegated authority, there is the antecedent question of whether the defendant is "an agent or officer of the Government purporting to act on its behalf." *Id.*; *see also Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000) (derivative sovereign immunity is available to "contractors and common law agents").

Courts addressing the derivative sovereign immunity doctrine have assumed that a private party may only act as an "agent or officer of the Government" when it has a *contractual* relationship of some form with the government.[4] *See e.g., Campbell- Ewald*, 577 U.S. at 166 ("When a *contractor* violates both federal law and the Government's explicit instructions, as here alleged, no 'derivative immunity' shields the *contractor* from suit by persons adversely affected by the violation." (emphasis added)); *Yearsley*, 309 U.S. at 19 (describing "work . . . done pursuant to a *contract* with the United States Government" (emphasis added)); *Taylor Energy Co., L.L.C. v. Luttrell*, 3 F.4th 172, 176 (5th Cir. 2021) ("The appropriate inquiry is whether Couvillion adhered to the Government's instructions *as described in the*

---

[4] There is some disagreement over whether defendants seeking to invoke derivative sovereign immunity must establish a common law agency relationship *in addition* to their contract with the federal government. *In re Fort Totten Metrorail Cases Arising Out of Events of June 22, 2009*, 895 F. Supp. 2d 48, 74 n.17 (D.D.C. 2012) (discussing disagreement among courts about whether a party claiming derivative sovereign immunity must establish a common law agency relationship with the government or whether working within the scope of a government contract may be enough).

*contract documents*." (emphasis added)); *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 70 (D.C. Cir. 2019) ("To claim immunity, KeyPoint had to establish 'compliance with all federal directions' pertaining to its relevant conduct, including the regulatory and contractual obligation to meet the  Privacy Act's standards in its *contract* operations [with the federal Office of Personnel Management]." (emphasis added)); *Al Shimari v. CACI Premier Tech., Inc.*, 657 F. Supp. 2d 700, 717 (E.D. Va. 2009) ("The Court is completely bewildered as to how Defendants expect the Court to accept this scope of contract argument when the contract is not before the Court on this motion.").

Based on this case law, the District Court made short work of Cultural Care's argument:

> Unlike the parties that successfully invoked derivative sovereign immunity in *Yearsley* and *Cunningham*, Cultural Care was not hired by the government to perform certain tasks; it voluntarily decided to apply to be a sponsor organization and operate an au pair program, and a condition of doing that was complying with the applicable regulations. Cultural Care is thus more akin to a company operating in a heavily regulated industry, like a bank, than a contractor hired by the government to perform a specific task. *Cf. City of Worcester v. HCA Management Co., Inc*., 753 F. Supp. 31, 37–38 (D. Mass. 1990) ("The Supreme Court has long held that, pursuant to sovereign immunity, a private company which contracts with the federal government to perform the duties of the government will not be held liable for its actions on behalf of the government.").

Appellant's Add. at 12. The District Court concluded by noting that "Cultural Care's arguments amount to saying that it operates in a heavily regulated area and therefore

should have derivative sovereign immunity, a principle that is far broader than the court can accept." *Id.* at 13.

It makes sense that courts generally require a contract with the federal government as a necessary element of the derivative sovereign immunity test. It is unlikely that the federal government would enter a "fiduciary relationship that arises when one person . . . manifests assent to [an agent to act on] the principal's behalf and subject to the principal's control" or permit the purported agent to "manifest[] assent or otherwise consent[] so to act" without there being a contract between the federal government and the purported agent. Restatement (Third) Of Agency § 1.01 (2006). Concluding that an agency relationship may exist absent a contractual relationship would open courts to derivative sovereign immunity defenses from a wide swath of private entities operating under the authorization of the federal government and subject to federal regulations.

In fact, Cultural Care cannot identify any case in which a private entity has benefitted from derivative sovereign immunity without some form of contractual relationship between it and the government. Even in *Evans v. Mayer Tree Serv., Inc.*, 162 N.E.3d 70, 73 (Mass. Ct. App. 2020)—which Cultural Care argues is such a case—there were contracts connecting all the parties to the federal government and spelling out a potential agency relationship: a federal agency contracted with a state agency, and the state agency contracted with the private party that claimed

28

immunity.[5]

Here, there is no contract between Cultural Care and the United States government. *Hilbert v. Aeroquip, Inc.*, 486 F. Supp. 2d 135, 148 (D. Mass. 2007) (no "colorable" derivative sovereign immunity defense where defendant "has not supplied any of its contracts with the government"). That should end the matter.

Even if an agency relationship sufficient to establish derivative sovereign immunity could exist in the absence of a contract, it does not exist here. This Court has clarified when addressing whether a private entity has the authority to act as an agent of the federal government that such authority exists only where the federal government has granted it "in clear and unequivocal terms." *Flemmi*, 225 F.3d at 85; *see Yearsley,* 309 U.S. at 21 (immunity requires following "the Government's explicit instructions"). A "designation" defined by regulation as a "written authorization issued by the Department of State," 22 C.F.R. § 62.2, does not come close to meeting that standard. A private entity cannot obtain immunity from suit

---

[5] Cultural Care cites *Evans v. United States*, 876 F.3d 375 (1st Cir. 2017) as the "parallel" case to the state court case. Appellant's Br. at 29 n. 4. There, this Court explains that a federal agency (Animal Plant and Health Inspection Service ("APHIS") entered into an "agreement" with the Massachusetts Department of Conservation and Recreation ("DCR"), and that DCR contracted with "contractors" to remove beetle-infested trees. *Id.* at 378 ("DCR entered into a cooperative agreement (the Agreement) with APHIS to jointly combat the ALB infestation."). Again, the immunity granted in the state court case to the contractor was a result of agency conveyed through contract. *See id.* at 379 ("an APHIS representative would go into the field with the tree-removal contractors hired by DCR").

because it has federal "authorization" to market a drug for an emergency use, 21 U.S.C. § 360bbb-3, operate a nuclear power plant, 10 C.F.R. § 26.53, enter a military facility, 32 C.F.R. § 761.8, or do any number of other things that the federal government may "authorize."

Furthermore, the specific regulations that Cultural Care argues create an agency relationship in this case expressly prohibit Cultural Care from even asserting that it acts on behalf of the federal government: "Sponsors must . . . [not] represent that its [sic] exchange visitor program is endorsed, sponsored, or supported by the Department of State or the U.S. Government." 22 C.F.R. § 62.9(d)(5). Rather, the same regulation clarifies, a sponsor may only "represent that it is designated by the Department of State as a sponsor of an exchange visitor program." *Id.* And nothing in those regulations purport to immunize sponsors from state law. In fact, the J-1 visa sponsor regulations command Cultural Care to "remain in compliance with all local, state, and federal laws," *see* 22 C.F.R. § 62.9,[6] and to designate Responsible Officers with a "detailed knowledge of federal, state, and local laws pertaining to employment," 22 C.F.R. § 62.11.

2.    <u>Cultural Care Cannot Establish as a Matter of Law that It Acted Within</u>

---

[6] Cultural Care has previously claimed that this requirement to comply "with all local, state, and federal laws … to carry out the activities for which it is designated" is limited to accreditation and licensure. But that is inconsistent with the text of the regulation, which states the requirement "include[s] accreditation and licensure," not that it is limited to accreditation and licensure. *See id.*

<u>Authority Validly Conferred by the Federal Government</u>

Even if Cultural Care could be entitled to derivative sovereign immunity via an agency relationship created by the au pair regulations, it is not protected by derivative sovereign immunity if it "exceeded [its] authority or the authority was not validly conferred." *Campbell-Ewald*, 577 U.S. at 167.

Cultural Care cannot establish that it acted within validly conferred authority. First, Cultural Care did not act within any such authority when it defrauded host families and au pair program participants and therefore cannot benefit from derivative sovereign immunity against Plaintiffs' consumer protection claims. Even if au pair regulations convey the agency relationship Cultural Care suggests they do, they do not authorize Cultural Care to make misrepresentations to host families and childcare workers on J-1 au pair visas. *See Faiella v. Fed. Nat'l Mortg. Ass'n,* 928 F.3d 141, 150 (1st Cir. 2019) ("[T]he record is devoid of anything that might suggest that Ditech personnel were granted actual authority by Fannie Mae to make the allegedly inaccurate representations that the appellant attributes to them."); *Brown v. Fort Benning Fam. Communities LLC*, 108 F. Supp. 3d 1367, 1374 (M.D. Ga. 2015) ("the Court can conceive of no legitimate reason to protect a private entity from [fraud] claims, particularly when no evidence exists in the present record that the Army played a material role in the alleged misrepresentations."). Indeed, rather than permitting misrepresentations, the au pair sponsor regulations require that

31

sponsors "[p]rovide accurate program information and materials to prospective exchange visitors, host organizations, and host employers…." 22 C.F.R. § 62.9(d)(3).

With respect to Plaintiffs' wage and hour claims, even if Cultural Care operates pursuant to an agency relationship, there are not enough facts in the record to determine whether Cultural Care's conduct giving rise to those claims falls within the scope of any purported agency relationship. At a minimum, this Court should remand for discovery on the issues of whether Cultural Care's purported authority was validly conferred and whether Cultural Care exceeded its authority. *See, e.g., In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) (reversing district court dismissal on derivative sovereign immunity ground because of a lack of record evidence supporting the immunity).

Discovery would be necessary to address a range of questions. For example, Plaintiffs allege that the activities making Cultural Care an employer under state law go beyond any regulatory requirements on sponsors. *See* Appellant's Add. at 18-20.[7] Thus, at least as alleged, Cultural Care is an "employer" subject to state

---

[7] This finding is in line with other federal and state trial courts to consider the same issue with respect to Cultural Care. *See id.* at 20 (citing *Kudlacz v. Cultural Care, Inc.,* Case No. CGC-20-584567, Slip. Op. p. 3. (Cal. Sup. Ct. Sept. 3, 2020); *Beltran v. Interexchange, Inc*., No. 14-CV-03074-CMA-KMT, 2016 WL 695967, at *10 (D. Colo. Feb. 22, 2016), report and recommendation adopted in part, rejected in part, 176 F. Supp. 3d 1066 (D. Colo. 2016)).

minimum wage requirements, and not immune, because it is acting *outside* any authority conferred by the regulations. *See id*. Discovery on whether Cultural Care's activities triggering employer status fall within any authority conferred by the State Department would therefore be necessary to resolve Cultural Care's assertion of derivative sovereign immunity to Plaintiffs' wage and hour claims. *See Campbell-Ewald Co.*, 577 U.S. at 167.

There are also factual questions about whether any conferral of authority from the State Department to Cultural Care would be valid. *See id*. There is some indication in publicly available communications about Cultural Care that Cultural Care is or was wholly owned by a Swiss entity named "EF Education First."[8] But an Au Pair Sponsor must be a "United States Person," which, in the case of an entity, requires a majority of its owners to be U.S. citizens or permanent residents. *See* 22 C.F.R. §§ 62.2 (defining "United States Person (legal entity)"), 62.3(a)(3) (requiring private sponsors to be "United States Persons"). If Cultural Care is or was owned by a foreign corporation during the period in which Plaintiffs claim that it violated their rights under state laws, it may not have been acting pursuant to "validly conferred" authority. That question too could be probed through discovery on remand.

---

[8] A 2016 EF Education First Company Fact Sheet lists Cultural Care Au Pair as a division or business unit of EF Education First. *See* Appellees' Add. at 24.

**E.     Plaintiffs' State Law Claims Are Not Preempted**

1.     <u>The Court Should Consider Preemption of the State Consumer Claims and the State Minimum Wage Claims Separately</u>

As a threshold matter, Cultural Care has presented no coherent argument why Plaintiffs' state consumer claims should be deemed preempted by federal law. Plaintiffs' consumer protection claims allege that Cultural Care deceived au pairs and host families by telling them that *host families* may lawfully pay au pairs less than state minimum wage. Even if Cultural Care were correct that Plaintiffs' state wage claims against Cultural Care are preempted by federal law (which Plaintiffs dispute), there is no reason why either field or conflict preemption principles should bar Plaintiffs consumer claims. Those claims pertain to representations about *the families'* wage obligations, which this Court, in a case in which Cultural Care was a party, has already concluded are not preempted by federal law, *Capron,* 944 F.3d 9. Furthermore, Plaintiffs' consumer protection claims are entirely consistent with the au pair regulations, which require Cultural Care to "[p]rovide accurate program information and materials to prospective exchange visitors, host organizations, and host employers…." 22 C.F.R. § 62.9(d)(3).

Cultural Care suggests that its misrepresentations are somehow authorized by State Department notices that require Cultural Care to tell host families to pay less than state minimum wage. *See* Appellant's Add. at 88, 90. Those notices do no such thing. They simply purport to inform sponsors about host families' *federal* minimum

wage obligations. *Id.* But federal minimum wage obligations do not supplant state minimum wage obligations. 29 U.S.C. § 218(a). Furthermore, those notices have been removed from the State Department au pair website and predate this Court's decision in *Capron* by a decade. Even if these notices did constitute a command from the State Department to inform host families to pay au pairs less than state minimum wage—which they do not—Cultural Care cannot rely on these stale, non-regulatory documents into perpetuity, while ignoring the clear holding from this Court in *Capron* regarding host family pay obligations and Cultural Care's regulatory obligation to be truthful to au pairs and host families. 22 C.F.R. § 62.9(d)(3).

### 2. Congress Did Not Authorize the State Department to Preempt State Minimum Wage Law

Before considering whether the au pair regulations preempt Cultural Care's obligations under state minimum wage laws, the Court must first consider whether Congress authorized the State Department to preempt those laws. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A] federal agency may preempt state law only when and if it is acting within the scope of its congressionally delegated authority."). "[T]he best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency." *City of New York v. F.C.C.*, 486 U.S. 57, 66 (1988).

The extent of Congress's delegation to the State Department is limited and

expresses concern that state labor laws be followed, not preempted. Congress has provided authority to the State Department to "designate" cultural exchange programs, 8 U.S.C. § 1101(a)(15)(J), and it has specifically authorized the agency "to continue to administer an au pair program, operating on a world-wide basis." *See* Pub. L. No. 104-72, 109 Stat. 776 (1995) (authorizing for two-years); *see also* Pub. L. No. 105-48, 111 Stat. 1165 (1997) (removing the two-year sunset).

Especially because the preemption question at issue here arises "in a field which the States have traditionally occupied," *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation and citation omitted), this Court should not read that limited delegation as providing the agency with the authority to preempt state labor protections that apply to and protect domestic childcare workers who compete in the labor market with employees working on J-1 au pair visas.

In fact, the history of the J-1 visa au pair program reveals that such a delegation would be antithetical to Congress's purposes.[9] The current authorization for the program, enacted in 1997, followed on the heels of criticism that the program amounted to a work program under the guise of a cultural exchange. A 1995 rulemaking by the United States Information Agency (USIA) explained that "the

---

[9] For a discussion of the history of Congress's authorizations of the au pair program, *see* Appellant's Add. at 3-5; *Capron v. Off. of Att'y Gen. of Massachusetts*, 944 F.3d 9, 15–16 (1st Cir. 2019); *Cultural Care, Inc. v. Off. of the Att'y Gen. of Massachusetts*, No. 16-CV-11777-IT, 2017 WL 3272011, at *4–5 (D. Mass. Aug. 1, 2017).

GAO [had] determined that certain Exchange Visitor Program activities appeared to be inconsistent with the statutory grant of authority and its underlying legislative intent" because the GAO had concluded that some J-1 cultural exchange programs had morphed into work programs under which "participants work[ed] as waiters, cooks, childcare providers, amusement and leisure park workers, and summer camp counselors." Exchange Visitor Program, 60 FR 8547-02, 60 Fed. Reg. 8547-53 (Feb. 15, 1995) (internal quotation marks omitted). With the 1995 rules, USIA sought not only to clarify and strengthen the educational components of the au pair program but also to ensure that the treatment of childcare workers on au pair visas reflected the conclusion that "an au pair is an employee" and should be treated like one lest the program become a vehicle for the "import of cheap foreign labor in the guise of an educational and cultural exchange program." *Id.*

In the wake of the 1995 rulemaking, Congress reauthorized the program for a two-year period. Legislative history accompanying that reauthorization reinforces Congress's expectation that USIA would not exempt the employers of J-1 visa au pairs from state or federal labor standards laws. Congressman Tom Lantos explained:

> It is extremely important . . . that the USIA and those who administer this program understand that this is an educational program—its purpose is to give young people experience with our country and its culture. Families who provide a home and food for foreign young people while they are here reasonably expect some assistance with household tasks. *But this is not a program to circumvent our nation's*

> *labor and immigration laws relating to employment in the United States by foreign citizens.* This is not a program to provide free child-care for upper-middle class Americans. It is not a program to get around our nation's labor laws. Those laws have been written for specific purposes, and the Au Pair Program must be consistent with our labor laws. It is extremely important that the international educational exchange component of this program be recognized and acknowledged as being central to this legislation.

H.R. 2767, To Extend Au Pair Programs: Markup Before the Subcomm. On Int'l Operations and Human Rights of the Comm. On Int'l Relations H.R., 104 Cong. 5 (1995) (Statement of Congressman Tom Lantos) (emphasis added).[10] In other words, in the view of the Congress authorizing the State Department to administer the au pair program, the educational purposes of the program would be undermined if the agency were to carve au pairs or their employers out of American labor laws. *See also Capron*, 944 F.3d at 26 ("It is hardly evident that a federal foreign affairs interest in creating a 'friendly' and 'cooperative' spirit with other nations is advanced by a program of cultural exchange that, by design, would authorize foreign nationals to be paid less than Americans performing similar work.").

In 1997, Congress removed the two-year sunset from the 1995 reauthorization after examining industry's compliance with the 1995 regulations. Pub. L. No. 104-72, 109 Stat. 776 (1995) ("This report shall specifically detail the compliance of all au pair organizations with regulations governing au pair programs as published on

---

[10] Included in Appellees' Addendum at 15-22.

February 15, 1995."); Pub. L. No. 105-48, 111 Stat. 1165 (1997) (permanently authorizing the au pair program after two years of Congressional study regarding the legality of the program); *see also* 60 Fed. Reg. 8547-53 (Feb. 15, 1995).

### 3.    The Au Pair Rules Do Not Preempt State Minimum Wage Law

Two important threshold principles guide the Court's analysis of Cultural Care's preemption argument. First, the touchstone of any preemption analysis is the intent of the regulator. *Wyeth*, 555 U.S. at 565 ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case."). Second, courts begin with the presumption that the State's historic police powers are not preempted "unless that was the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996)); *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 21 (1987) ("pre-emption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State.").

This Court is familiar with Cultural Care's preemption arguments, having heard and rejected them previously. *See generally Capron*, 944 F.3d 9. Cultural Care attempts to distinguish *Capron* because that case involved application of state law to host families, and Plaintiffs here seek to hold Cultural Care responsible for complying with state minimum wage requirements. But this is a distinction without a difference. The question is whether the State Department intended to preempt

sponsor agencies' responsibilities under state minimum wage laws. There is no indication in the language of the State Department's rules or in its regulatory history that it held such an intent with respect to sponsor agencies but not with respect to host families.

To date at least four trial or appellate courts have heard and rejected similar preemption arguments advanced by sponsor agencies like Cultural Care. *Beltran.*, 2016 WL 695967 at *14 ("the court finds Defendants' contention that an overall federal scheme and/or federal regulations pre-empt the state minimum wage laws in this country as applied to au pairs has no support under federal law"); *Betancourt v. Cultural Care, Inc*., Case No. 2081CV0056 (Mass. Sup. Ct., Nov. 16, 2020) (Slip Op. p. 9) (rejecting Cultural Care's attempt to distinguish *Capron*'s holding because "the reasoning the court applied in rejected the field preemption argument applies with equal force to Defendants if they are characterized as [p]laintiffs' joint employers"); *Kudlacz*, Case No. CGC-20-584567 (Slip Op. p. 2); *Padron v. GreatAuPair, LLC*, Case No. CGC-20-587057 (Cal. Sup. Ct. Feb. 16, 2021) (Slip Op. p. 1) (rejecting sponsor agency Great Au Pair's argument that the au pair program regulations preempt state and local wage and hour laws). This Court should reach the same conclusion.

### (a)    *There is no field preemption as to sponsor agencies*

Per the implied preemption doctrine of field preemption, "the States are

precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Field preemption will exist when the regulatory framework is "'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* The existence of a detailed federal scheme, however, is not evidence of preemptive intent. Rather, a "detailed [federal] scheme [is] . . . likely and appropriate, completely apart from any questions of pre-emptive intent." 424 U.S. at 360 (quoting *New York State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973)).

In *Capron*, this Court concluded that "the 'nature and complexity' of the federal subject matter made the 'detailed statutory scheme likely and appropriate, completely apart from any questions of pre-emptive intent.'" *Capron*, 944 F.3d at 24 (quoting *DeCanas v. Bica*, 424 U.S. 351, 360 (1976)). Cultural Care seeks to circumvent *Capron* by arguing that State Department regulations "occupy the field of sponsors' obligations, and certainly occupy the field of any wage and hour obligations." Appellant's Br. at 35.

There are several problems with Cultural Care's argument. First, even though State Department regulations place extensive requirements on sponsor agencies like

Cultural Care, those regulations do not "occupy the field of sponsors' obligations" under state law. Appellant's Br. at 35. If state regulation of *all* sponsor obligations were preempted, that would mean that sponsors are exempt from state tax regulation, state health and safety codes, state consumer fraud laws, and the full panoply of regulations traditionally within a state's police powers. But there is no evidence of a Congressional or regulatory intent to preempt all sponsor agency responsibilities under state law. In fact, as explained above, the State Department requires sponsor like Cultural Care "remain in compliance with all local, state, and federal laws . . .." 22 C.F.R. § 62.9. Nothing about such compliance is inconsistent with extensive regulation of sponsor agencies in other ways.

The State Department also did not intend to occupy the field of state wage and hour law with respect to sponsor agencies in particular. The notion that a "field" may be segmented in this manner finds no support in this Court's preemption jurisprudence. Indeed, the argument is incompatible with "the basic premise of field preemption—that States may not enter, *in any respect*, an area the Federal Government has reserved for itself." *Arizona*, 567 U.S. at 402 (emphasis added).

The argument also does not find support in *Capron*. There, this Court described the "detailed and comprehensive" regulation of au pairs and sponsor agencies, but the Court did "not see why . . . that fact alone justifies the inference that the federal government intended the Au Pair Program to preempt a field that

would encompass" state minimum wage protections. *Capron,* 944 F.3d at 24. In some states, Plaintiffs allege, childcare workers on J-1 au pair visas have a right to state minimum wage from their employers. There is nothing in State Department regulations suggesting an intention to strip workers of their right to minimum wage with respect to some employers (host families) but not with respect to others (sponsors). The State Department did not intend to split the field of worker wage and hour protections and "oust state employment laws that define, as part of a generally applicable regulatory scheme, the rights and duties" of employers under state law. *Id.*

Cultural Care's contention that State Department regulations are so comprehensive and pervasive as to occupy the "field of [sponsor agency's] wage and hour obligations," even when this Court has already concluded that host family obligations are undisturbed by those same regulations, is a particularly remarkable assertion given that the regulations contemplate that host families and not sponsor agencies will be the ones *paying* childcare workers on J-1 au pair visas. The regulations do say that sponsor agencies "shall require" host families to pay childcare workers on J-1 au pair visas "in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor." 22 C.F.R. § 62.31. But this hardly constitutes a "pervasive" and "comprehensive scheme" of regulation evidencing an intent "to displace state

law altogether" with respect to Cultural Care's wage and hour obligations. *Hillsborough Cnty, Fla v. Automated Med. Labs., Inc*., 471 U.S. 707, 714 (1985). And it certainly does not suggest that sponsor agencies will not be responsible for higher state minimum wages under state law if they act as an employer under state law. In fact, the precise language of the regulation is unhelpful for Cultural Care, given that the Fair Labor Standards Act expressly does not preempt higher state minimum wages. *See* 29 U.S.C. § 218(a) ("No provision of this chapter or of any order thereunder shall excuse noncompliance with any … State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter…."); *Maccabees Mut. Life Ins. Co. v. Perez-Rosado*, 641 F.2d 45, 46 (1st Cir. 1981) ("The FLSA does not expressly prohibit state legislation in the area of wages and working conditions. To the contrary, it (FLSA) specifically contemplates state regulation' of labor conditions." (internal quotation marks omitted)).

In search of evidence of preemptive intent, Cultural Care points to an amicus brief the State Department filed in *Capron* and asks the Court to give it *Auer* deference. Appellant's Br. at 39. But this Court in *Capron* rejected those amicus arguments and found they did not support a preemption finding. *See Capron*, 944 F.3d at 40 ("the DOS's explanation . . . fails to warrant a finding of either field or obstacle preemption.").

Cultural Care also relies on the State Department's April 2021 Notice of Rulemaking as evidence of an historic intent by the agency to preempt state law. *See* Appellant's Br. at 40. But the reverse is true: the new proposed rulemaking shows that the State Department believes its current regulations do *not* reflect an intent to preempt state wage laws, hence the need to expressly preempt state laws in the new rule.

**(b)    *There is no conflict preemption because the regulations do not set a ceiling on wages.***

Conflict preemption exists where compliance with both state and federal law is impossible, or where state law is an obstacle to the accomplishment and execution of the purpose and objectives of the federal law. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015). Cultural Care offers four reasons why conflict preemption applies here. None is persuasive.

First, Cultural Care argues that "converting" sponsors into employers would be logistically difficult and potentially costly because they would have to comply with the wage and hour laws of multiple jurisdictions. As an initial matter, Appellees' dispute the notion that they are arguing for "converting" sponsors into employers. The question is not whether the federal regulations "convert" sponsors into employers, but rather whether state laws imposing employer obligations on sponsors would conflict with federal regulations. The answer to that question—in *Capron* and here—is no. *See Capron*, 944 F.3d at 40 ("[A]as we have noted, by

terms, the 'Exchange Visitor Program' regulations address only the obligations that sponsors must meet in order to avoid the sanctions that the DOS may impose on them under the regulations. The regulations do not, by terms, purport to define the obligations of the employers themselves that those whom they employ may enforce against them.").

Cultural Care's reliance on *Buckman Co. v. Plaintiffs' Legal Comm*., 531 U.S. 341, 350 (2001) underscores the weakness of its argument. Appellant's Br. at 44. In *Buckman*, the state law claims were predicated entirely on violations of federal law. As the Supreme Court explained, "were plaintiffs to maintain their fraud-on-the-agency claims here, they would not be relying on traditional state tort law which had predated the federal enactments in questions. On the contrary, the existence of these federal enactments is a critical element in their case." *Id*. at 353. The opposite is true here. The state wage and hour laws at issue "are generally applicable to all domestic workers" and *predate* the au pair exchange program regulations by more than a half century. "Thus, they are not predicated on the existence of the federal au pair exchange program regulations." *Capron*, 944 F. 3d at 23 (rejecting Cultural Care's reliance on *Buckman*).

Further, the possibility that compliance with wage and hour regulations might be costly is not evidence that those laws are an obstacle to accomplishment of the objectives of Congress. Many industries are subject to simultaneous state and federal

regulation. And many employers are required to comply with the wage and hour laws of multiple jurisdictions. In fact, far from excusing compliance with state law, as explained elsewhere federal regulations require sponsor agencies to comply with "all local, state, and federal laws," 22 C.F.R. § 62.9, and mandate that those agencies operating programs with an employment component "have a detailed knowledge of federal, state, and local laws pertaining to employment," 22 C.F.R. § 62.11. These and other federal regulations suggest that "the Au Pair Program operates parallel to, rather than in place of, state employment laws that concern wages and hours and that protect domestic workers generally." *Capron*, 944 F.3d at 30–31.

Second, Cultural Care argues that "converting" sponsors into employers would conflict with the State Department's policy choice in making sponsors "administrators" of the au pair program. Again, though, Appellees do not contend that sponsors are employers merely because they are sponsors. Rather, Cultural Care is an employer because of the authority and control it holds and exercises over childcare workers on J-1 au pair visas, including authority and control far in excess of what is required by State Department regulations. *See* Appellant's Add. at 18-20 (District Court Order finding Plaintiffs alleged Cultural Care's control over au pairs exceeded regulatory requirements).

Cultural Care also fails to explain how application of state wage and hour laws against sponsor agencies would pose an obstacle to the Au Pair Program's foreign

affairs objective. Congress intended the Au Pair Program to "promote international cooperation" and "assist in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world." 22 U.S.C. § 2451. Requiring sponsor agencies that behave like employers under state law to comply with state minimum wage requirements is not an obstacle to creating a "'friendly' and 'cooperative' spirit with other nations." *See Capron*, 944 F.3d at 26. And nothing about application of state minimum wage laws against sponsor agencies prevents those agencies from interviewing applicants, engaging regularly with au pairs, and otherwise comply with their regulatory obligations consistent with the program's foreign affairs objectives.

Third, Cultural Care argues that "sponsors' compliance with state wage and hour laws would result in the displacement of the specific monitoring requirements that the State Department imposed." Appellant's Br. at 45. While Cultural Care lists various obligations an employer might have under New York, Massachusetts, and other states' wage laws, it offers no persuasive explanation why those responsibilities would interfere with its existing obligations under federal law. To the contrary, monitoring that au pairs are treated in accordance with minimum labor standards would be entirely consistent with Cultural Care's monitoring obligations. For example, 22 C.F.R. § 62.31(l), which sets forth sponsors' monitoring obligations, requires that Sponsors "fully monitor all au pair exchanges." The

regulation then identifies certain specific monitoring functions which Sponsors shall perform "*at a minimum*." *Id*. (emphasis added). Thus, the regulations expressly contemplate that the delineated monitoring functions are a floor, not a ceiling, on sponsors' obligations. This reading is consistent with other sections of the regulations, which expressly provide that sponsors must monitor "the progress and welfare of exchange visitors," 22 C.F.R. § 62.10(d)(2), and "remain in compliance with all local, state, and federal laws." 22 C.F.R. § 62.9.

Finally, Cultural Care argues that allowing wage and hour suits to go forward against it "would conflict with the State Department's chosen enforcement mechanism." Appellant's Br. at 47. But Cultural Care is mixing apples with oranges. Appellees do not argue that the federal regulations *create liability or a damages regime* for wage and hour violations. If that were the case, there might be some validity to Cultural Care's argument. *See Buckman*, 531 U.S. at 350. Instead, the regulations *expressly envision* a place for state and local laws within the exchange program. 22 C.F.R. § 62.9. Whether the *State Department's* remedy for Sponsor non-compliance with *regulatory requirements* is limited to exchange program suspension or termination says nothing about the remedies available to *program participants* (or state and local governments themselves, for that matter) resulting from sponsors' violations of state and local laws. The logical implication of Cultural Care's argument is a grant of immunity for an enormous array of potential unlawful

49

conduct, including tax fraud, health and safety violations, and consumer fraud.

**F.     The Complaint Plausibly Pleads That Cultural Care Is a FLSA Employer**

Lastly, the Court should affirm the District Court's holding that Plaintiffs adequately alleged Cultural Care employed them under the FLSA—the third court to reach the same conclusion as to Cultural Care. *See* Appellant's Add. at 20 (citing *Kudlacz,* Case No. CGC-20-584567, Slip. Op. p. 3; *Beltran*, 2016 WL 695967, at *10).

Cultural Care sought dismissal below based on the singular argument that "merely following federal regulations . . . does not make it an employer." Appellant's Add. at 18. But as the District Court properly recognized, Plaintiffs allege that Cultural Care's activities extend beyond the mere requirements of the au pair regulations. For example, "Plaintiffs allege that Cultural Care retains the exclusive right to determine—for reasons not necessarily dictated by these regulatory stipulations—that a host family isn't suitable and to remove the family from the program." Appellant's Add. at 19. Moreover, Cultural Care "allegedly retains full discretion of whether to end an au pair's placement, App. at 15-56, ¶ 24(j) (operative complaint), whether to end an au pair's participation in the program entirely, *id.* at ¶ 26, and whether to permit their participation in the first place. *Id.* at ¶ 25. And the full discretion Cultural Care allegedly exercises in these areas goes beyond the explicit requirements of the relevant regulations." Appellant's Add. at 19 (District

50

Court citations to complaint in original). "And finally, Cultural Care retains discretion on what to instruct host families to pay *au pairs*, though it is limited at the lower end by required compliance with the FLSA." Appellant's Add. at 20.

Cultural Care's attempt to shoehorn Plaintiffs' allegations into the regulations fails. For example, Cultural Care points to its regulatory obligation to *report* incidents of "unusual or serious situations" and "crime[s] of moral turpitude or violence." Appellant's Br. at 55 (citing 22 C.F.R. § 62.31). But an obligation to report certain incidents falls far short of full discretion to reject an application "for any reason it deems advisable" or to terminate "if the au pair engages in conduct that Cultural Care believes in not in the best interest of the program." App. at 20, ¶¶ 25-26. Indeed, the regulations expressly provide that sponsor agencies "shall terminate" an au pair who "[v]iolates . . . *the sponsor's rules* governing the program, if, in the sponsor's opinion, termination is warranted." 22 C.F.R. § 62.40 (emphasis added). It strains credulity to suggest that a sponsor agency creating its *own* rules and terminating participants for non-compliance with those rules would be merely carrying out its regulatory obligations.

Thus, the District Court correctly recognized that "Cultural Care's policies, as alleged by Plaintiffs, are clearly designed to enforce the government's regulations, but they are also broader than is strictly required by the regulations." Appellant's Add. at 20. Plaintiffs' allegations regarding Cultural Care's extensive control over

childcare workers on J-1 au pair visas adequately allege an employment relationship.

Cultural Care's appeal brief also devotes seven pages to arguments regarding employer status that Cultural Care did not raise below. Cultural Care's primary argument on appeal—which appears nowhere in the briefing below—is that Plaintiffs failed to allege facts sufficient to satisfy the economic reality test outlined in *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668 (1st Cir. 1998). Appellant's Br. at 49-54. The Court should not wade into the *Baystate* analysis because "arguments not raised in the district court cannot be raised for the first time on appeal." *Rockwood v. SKF USA Inc.*, 687 F.3d 1, 9 (1st Cir. 2012). Given Cultural Care's spurious reliance on pendant appellate jurisdiction, it would be especially inappropriate for this court to address these arguments in the first instance.[11]

Cultural Care also argues that the District Court misapplied *Ivanov v. Sunset Pools Management, Inc.*, 567 F.Supp.2d 189, 195 (D.D.C. 2008). These arguments are also new on appeal, as Defendant provided no analysis of *Ivanov* below. App. at 7, 11; Dkt Nos. 67, 133. Regardless, the district court's analysis is correct. There is no suggestion in *Ivanov* that the sponsor agency retained full discretion to end a

---

[11] Even so, Cultural Care's challenges to the District Court's analysis fails under *Baystate*. For example, Cultural Care argues that the District Court improperly focused on its relationship with host families. But Cultural Care's alleged right to determine that a host family's environment is not suitable, Appellant's Add. at 19, is relevant to Cultural Care's control over Plaintiffs' "conditions of employment." *See Baystate*, 163 F.3d at 675.

participant's employment, as Plaintiffs allege here. *See Ivanov*, 567 F.Supp.2d 189. This right extends far beyond a sponsor agency's purported right to terminate a participant for willfully failing to maintain required insurance. *See* Appellant's Br. at 54 n.8 (citing 29 C.F.R. § 62.14 (h)-(j) regarding insurance). *Ivanov*—an out-of-circuit district court decision on a motion for summary judgment—is no basis to overturn the District Court's denial of Cultural Care's motion to dismiss.[12]

## CONCLUSION

For all these reasons, Plaintiff respectfully requests that Cultural Care's appeal be denied and this case remanded to the District Court for further proceedings.

Respectfully Submitted,

*s/ David H. Seligman*
DAVID H. SELIGMAN
TOWARDS JUSTICE
PO Box 371680
PMB 44465
Denver, Colorado 80237-5680
Ph: (720) 441-2236
david@towardsjustice.org

MATTHEW C. HELLAND
NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810
San Francisco, CA 94104
Ph: (415) 277-7239

---

[12] Cultural Care also cites *Knitter v. Corvias Mil. Living, LLC*, an out-of-circuit case addressing a different statute (Title VII) and a different factual circumstance. 758 F.3d 1214 (10th Cir. 2014). *Knitter* is inapposite for these reasons, and is also inapplicable here because Cultural Care did not cite it below.

53

helland@nka.com

PETER RUKIN
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, CA 94612
Ph: (415) 421-1800
prukin@rukinhyland.com

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel certified that this document complies as follows:

This document complies with the type-volume limit of Fed. R. App. P. 32(a) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,974 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in size 14-point Times New Roman font

Date: March 14, 2022                    *s/ David H. Seligman*
                                        Attorney for Plaintiffs-Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2022, I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to all Defendants-Appellees that have appeared:


Date: March 14, 2022                    *s/ David H. Seligman*
                                        Attorney for Plaintiffs-Appellees

# APPELLEES' ADDENDUM

## APPELLEES' ADDENDUM

Page

Brief for the United States as Amicus Curiae Supporting Petitioners, Al
    *Shimari v. CACI Premier Tech., Inc.,* No. 19-648 (U.S. Aug. 26,
    2020) (Excerpt) ................................................................................................ 1

H.R. 2767, To Extend Au Pair Programs: Markup Before the Subcomm. on
    Int'l Operations and Human Rights of the Comm. on Int'l Relations
    H.R., 104 Cong. 5 (1995) ............................................................................ 14

EF Education First, Company Fact Sheet 2016 ...................................................... 23

No. 19-648

# In the Supreme Court of the United States

---

CACI Premier Technology, Inc., petitioner

*v.*

Suhail Najim Abdulla Al Shimari, et al.

---

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT*

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

---

Jeffrey B. Wall
  *Acting Solicitor General
  Counsel of Record*
Hashim M. Mooppan
  *Counselor to the Solicitor
  General*
Sopan Joshi
  *Senior Counsel to the
    Assistant Attorney General*
Benjamin W. Snyder
  *Assistant to the Solicitor
  General*
H. Thomas Byron III
Daniel Winik
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

**QUESTION PRESENTED**

Whether the collateral-order doctrine permits immediate appeal from the denial of a motion to dismiss on the basis of the so-called "derivative sovereign immunity" defense.

(I)

5

"that 'fully developed rulings' denying 'sovereign immunity (or derivative claims thereof) may not' be immediately appealable." Pet. App. 4a (quoting 679 F.3d 205, 211 n.3). And the majority reasoned that, "even if a denial of derivative sovereign immunity may be immediately appealable," CACI cannot obtain interlocutory review "because there remain continuing disputes of material fact with respect to [its] derivative sovereign immunity defenses"—namely disputes as to "whether CACI violated the law or its contract." *Id.* at 4a-5a. The majority therefore concluded that CACI's appeal did not "turn on an abstract question of law" and accordingly was "not properly before" the court. *Id.* at 5a.

Judge Quattlebaum concurred in the judgment. Pet. App. 6a-7a.

## DISCUSSION

The court of appeals correctly determined that it lacked jurisdiction to hear CACI's interlocutory appeal in this case, though its reasoning was incorrect. Because the district court's decision rested solely on a pure, and erroneous, conclusion of law (that the United States has waived its sovereign immunity from suits alleging violations of *jus cogens* norms), no disputed issue of fact prevented the court of appeals from exercising jurisdiction. Nevertheless, the court of appeals did lack jurisdiction, because the so-called "derivative sovereign immunity" doctrine CACI is asserting does not afford a genuine immunity from suit, as distinct from a defense to liability on the merits. Pre-trial orders rejecting an assertion of the doctrine thus are not immediately appealable under the collateral-order doctrine.

Although the decision below reached the correct result, the question presented warrants this Court's review. There is tension in the lower courts' approaches

6

to applying the collateral-order doctrine in the context of orders denying federal contractor defenses like the one at issue here, and the courts of appeals also are divided about the nature of the "derivative sovereign immunity" doctrine. Rather than granting the petition for a writ of certiorari immediately, however, the Court should hold the petition pending its decisions in *Nestlé USA, Inc.* v. *Doe*, cert. granted, No. 19-416 (July 2, 2020), and *Cargill, Inc.* v. *Doe*, cert. granted, No. 19-453 (July 2, 2020). Those decisions may effectively foreclose respondents' underlying substantive claims. If they do not, the Court should grant the petition for a writ of certiorari and affirm.

A. **The Court Of Appeals Correctly Determined That It Lacked Jurisdiction Over Petitioner's Interlocutory Appeal**

1. "Finality as a condition of review is an historic characteristic of federal appellate procedure," dating to the first Judiciary Act, ch. 20, §§ 21-22, 25, 1 Stat. 83-87 (1789). *Cobbledick* v. *United States*, 309 U.S. 323, 324 (1940). The finality requirement is now codified in 28 U.S.C. 1291, which provides that the courts of appeals "shall have jurisdiction of appeals from all final decisions of the district courts of the United States, * * * except where a direct review may be had in the Supreme Court." *Ibid.* "A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin* v. *United States*, 324 U.S. 229, 233 (1945).

This Court has "long given" Section 1291 a "practical rather than a technical construction." *Cohen* v. *Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). It has held that "the statute entitles a party to appeal * * * from a narrow class of decisions that do not terminate

7

the litigation, but must, in the interest of achieving a healthy legal system, nonetheless be treated as 'final.'" *Digital Equip. Corp.* v. *Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (citations and some internal quotation marks omitted). That "small class" encompasses decisions that "finally determine claims of right separable from, and collateral to, rights asserted in the action." *Cohen*, 337 U.S. at 546.

The Court has applied a three-part test to determine whether a "category" of orders is immediately appealable under the collateral-order doctrine. *Mohawk Indus., Inc.* v. *Carpenter*, 558 U.S. 100, 107 (2009) (citation omitted); see *Van Cauwenberghe* v. *Biard*, 486 U.S. 517, 529 (1988) ("In fashioning a rule of appealability under § 1291, * * * we look to categories of cases, not to particular injustices."). To be immediately appealable, an order that does not terminate the litigation must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." *Will* v. *Hallock*, 546 U.S. 345, 349 (2006) (citations omitted; brackets in original).

The Court has stressed that the collateral-order doctrine "must 'never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered.'" *Mohawk Indus.*, 558 U.S. at 106 (quoting *Digital Equip.*, 511 U.S. at 868). Accordingly, the Court has recognized only a small number of types of orders as immediately appealable under the collateral-order doctrine. They include, for example, orders denying absolute immunity, *Nixon* v. *Fitzgerald*, 457 U.S. 731, 742 (1982); deny-

8

ing Eleventh Amendment immunity, *Puerto Rico Aqueduct & Sewer Auth.* v. *Metcalf & Eddy, Inc.*, 506 U.S. 139, 144-147 (1993); and denying qualified immunity on legal grounds, *Mitchell* v. *Forsyth*, 472 U.S. 511, 530 (1985); as well as, among others, orders rejecting a double-jeopardy defense to retrial, *Abney* v. *United States*, 431 U.S. 651, 656-662 (1977). In each such case, the Court has emphasized, "'the essence' of the claimed right" has been more than a defense against liability; it has been "a right not to stand trial" in the first place. *Van Cauwenberghe*, 486 U.S. at 524 (quoting *Mitchell*, 472 U.S. at 525).

2. Under the foregoing principles, the court of appeals lacked jurisdiction to hear CACI's interlocutory appeal.

CACI claims that the court of appeals' decision conflicts with this Court's holdings "that orders denying absolute immunity, qualified immunity, and Eleventh Amendment immunity are all immediately appealable." Pet. 1-2. It asserts that, like those doctrines, the so-called "derivative sovereign immunity" doctrine supplies an "immunity from suit." *Id.* at 11-12.

Despite often being referred to as derivative sovereign "immunity," however, the doctrine that CACI invokes is not genuinely an immunity at all; it is merely a defense to liability. Orders rejecting a "derivative sovereign immunity" defense, even on purely legal grounds, therefore do not satisfy the effective-unreviewability requirement of the collateral-order doctrine. And because the "derivative sovereign immunity" defense requires that the government contractor have complied with all relevant federal requirements, decisions ad-

9

dressing the defense at preliminary stages of a case often also will not satisfy the separateness and conclusiveness requirements of the collateral-order doctrine.

a. Federal contractors do not "share the Government's unqualified immunity from liability and litigation." *Campbell-Ewald Co.* v. *Gomez*, 136 S. Ct. 663, 672 (2016). As Justice Holmes put it nearly a century ago, while the federal government generally "cannot be sued for a tort, * * * its immunity does not extend to those that acted in its name." *Sloan Shipyards Corp.* v. *U.S. Shipping Bd. Emergency Fleet Corp.*, 258 U.S. 549, 568 (1922); see *Brady* v. *Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943) ("Immunity from suit * * * cannot be * * * obtained" through "a contract between [the defendant] and the [government].").

"Derivative sovereign immunity" is therefore a misnomer. The defense known by that name is not a derivative form of the government's own immunity, because this Court has stated unambiguously that contractors cannot assert a right to that immunity in U.S. courts.[1] Rather, the doctrine known as "derivative sovereign immunity" reflects the principle this Court articulated in *Yearsley* v. *W. A. Ross Construction Co.*, 309 U.S. 18 (1940): A contractor cannot be held liable for exercising authority "validly conferred" by the government. *Id.* at 20-21. A contractor may be held liable, by contrast, where it "exceeded [the] authority" conferred by the government or where the authority "was not validly conferred." *Id.* at 21; see *Campbell-Ewald*, 136 S. Ct. at 672 ("When a contractor violates both federal law and

---

[1] The question of whether the government can argue that a contractor should be sheltered by its sovereign immunity in an adjudication in a foreign or international court or tribunal pursuant to applicable foreign or international law is not presented in this case.

10

the Government's explicit instructions, * * * no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation.").[2]

The doctrine discussed in *Campbell-Ewald* and *Yearsley* accordingly resembles the common-law rule that a principal may delegate to agents its "privilege" to take certain actions that would be unlawful if committed by others. See, *e.g.*, Restatement (Second) of Agency § 217 cmt. a, at 469 (1958) ("A privilege may result from the consent of another" or "may be created by the law irrespective of consent," and "[m]ost of these privileges are delegable."); see also *id.* § 217 cmt. b, at 470 ("Immunities, unlike privileges, are not delegable and are available as a defense only to persons who have them."). Thus, for example, a sheriff has "the privilege * * * to arrest" and interrogate people whom he or she has probable cause to believe have committed crimes, even though such arrests and interrogations generally would be unlawful if undertaken by a private party. *Id.* § 217 cmt. a, at 469. And "the sheriff can procure assistance in" exercising that privilege from others, who then likewise act lawfully when they help to detain or interrogate a criminal suspect. *Ibid.* But if the agent exceeds the scope of the privilege delegated by the principal—or if the principal never had the asserted privilege to begin with—then the agent's conduct may give rise to liability. See *id.* § 343 cmt. c, at 105.

---

[2] Some persons who perform services for the government may also be entitled to qualified immunity for wrongs they commit while performing those services, in circumstances where they are not alleged to have violated clearly established law. *E.g.*, *Filarsky* v. *Delia*, 566 U.S. 377, 393-394 (2012). The petition for a writ of certiorari in this case, however, does not contend that petitioner is entitled to qualified immunity.

11

This understanding of "derivative sovereign immunity" sharply distinguishes it from actual immunities, including the federal government's sovereign immunity. The critical feature of "an immunity" is that it "frees one who enjoys it from a lawsuit whether or not he acted wrongly." *Richardson* v. *McKnight*, 521 U.S. 399, 403 (1997). Where the government has not waived it, for example, sovereign immunity serves as "an impregnable legal citadel where government  * * * may operate undisturbed by the demands of litigants." *United States* v. *Shaw*, 309 U.S. 495, 501 (1940). Similarly, "the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." *Mitchell*, 472 U.S. at 525. And under the doctrine of qualified immunity, even where "the plaintiff's claim * * * in fact has merit," a government official is entitled to have the suit dismissed unless the official's unlawful conduct violated a "'clearly established'" right. *Camreta* v. *Greene*, 563 U.S. 692, 705 (2011) (citation omitted). By contrast, when a government contractor acting as an agent of the government exercises a validly delegated privilege, the contractor is not immune from suit for unlawful conduct; rather, the contractor is protected from liability only to the extent—and only *because*—it is acting lawfully. See *Campbell-Ewald*, 136 S. Ct. at 672 (holding that "[w]hen a contractor violates both federal law and the Government's explicit instructions * * * , no 'derivative immunity' shields the contractor from suit").

b. Because "derivative sovereign immunity" is properly understood as a defense to liability on the ground that the defendant acted lawfully, rather than as a broader immunity from suit, pre-trial orders rejecting claims of so-called derivative sovereign immunity

12

are not "effectively unreviewable on appeal from a final judgment." *Will*, 546 U.S. at 349 (citation omitted).

In assessing whether a threshold ruling would be effectively unreviewable without an interlocutory appeal, this Court has explained that "the decisive consideration is whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Mohawk Indus.*, 558 U.S. at 107 (quoting *Will*, 546 U.S. at 352-353). For example, the "ultimate justification" for "application of the collateral order doctrine" to orders rejecting Eleventh Amendment immunity is the need to avoid wrongfully "'subjecting a State to the coercive process of judicial tribunals at the instance of private parties'"—a "dignitary interest[]" that cannot "be fully vindicated" on appeal if the trial has already occurred. *Puerto Rico Aqueduct & Sewer Auth.*, 506 U.S. at 146 (quoting *In re Ayers*, 123 U.S. 443, 505 (1887)).

Orders denying government contractors' assertions of "derivative sovereign immunity" in U.S. courts do not, as a category, implicate that sort of substantial, effectively irreparable interest. See *Van Cauwenberghe*, 486 U.S. at 529 (observing that the collateral-order doctrine "look[s] to categories of cases, not to particular injustices"). Even if an erroneous denial leads to an unwarranted award of damages against a government contractor, that award—like any "erroneous ruling on liability"—"may be reviewed effectively on appeal from final judgment." *Swint* v. *Chambers Cnty. Comm'n*, 514 U.S. 35, 43 (1995). To be sure, requiring government contractors to wait until final judgment to appeal may force those contractors to incur "unnecessary trouble and expense" litigating a case that should have been dismissed. *Lauro Lines s.r.l.* v. *Chasser*, 490 U.S. 495, 499

13

(1989). This Court, however, has "declined to find the costs associated with unnecessary litigation to be enough to warrant allowing the immediate appeal of a pretrial order." *Ibid.*

CACI argues that the interests "that justify immediate appeals of denials of absolute and qualified immunity—'distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service'—are of equally high value in the context of government contractors." Reply Br. 10 (citation omitted). Any concerns about government contractors being unwilling to do business with the government, however, are mitigated by the potential ability of government contractors to price litigation risks into their contracts. Cf. *Richardson*, 521 U.S. at 409 ("[T]he most important special government immunity-producing concern—unwarranted timidity—is less likely present, or at least is not special, when a private company subject to competitive market pressures operates a prison."). Nor do suits in U.S. courts against government contractors implicate the "dignitary interests" that arise when a sovereign government is "'subject[ed] * * * to the coercive process of judicial tribunals at the instance of private parties.'" *Puerto Rico Aqueduct & Sewer Auth.*, 506 U.S. at 146 (quoting *In re Ayers*, 123 U.S. at 505). Accordingly, suits against government contractors do not, as a class, present the same level or type of concern that this Court has previously identified as sufficient to warrant immediate appeal under the collateral-order doctrine.[3]

_____

[3] Because government contractors lack sovereign dignitary interests, and because the government's own immunity from suit in U.S. courts is not delegated to government contractors, see pp. 9-11, *su-*

14

c. Orders rejecting a *Yearsley*-based defense also generally do not "resolve an important issue completely separate from the merits of the action," *Will*, 546 U.S. at 349 (citation omitted). To the contrary, the question whether a defendant is entitled to "derivative sovereign immunity" is often coterminous with the merits of the action. That is because such a defense applies only where and to the extent that the defendant acted lawfully—not, as with the sorts of true immunities discussed above, even where the defendant acted unlawfully. See pp. 9-11, *supra*.

CACI's assertion of the defense here illustrates the point. CACI could not demonstrate entitlement to the defense without proving that it acted within the scope of a lawful delegation from the government. *Campbell-Ewald*, 136 S. Ct. at 672. But respondents' claims themselves rest on the premise that CACI "violate[d] both federal law and the Government's explicit instructions." *Ibid.*; see, *e.g.*, D. Ct. Doc. 254, at 41 (Apr. 4, 2013) (alleging that CACI "directly contradicted" domestic law as well as the "express terms" of its contract with the United States). Thus, if respondents were to prove the merits of their liability claims, then CACI would not be entitled to "derivative sovereign immunity"—and if CACI were to show its defense was valid, then respondents would necessarily fail to prove the merits.

d. Finally, in some cases, orders rejecting pre-trial assertions of the defense will not "conclusively determine the disputed question." *Will*, 546 U.S. at 349 (citation omitted). In particular, where such an order is

_____

*pra*, this case would not be an appropriate vehicle in which to address whether the federal government has a right to immediately appeal orders denying motions to dismiss on the ground of federal sovereign immunity. See Pet. 15-17.

15

based on the existence of factual disputes that are material to the "derivative sovereign immunity" defense, the order will generally just defer final resolution of the defense until trial.

To be sure, the order here did not come within the category of orders that defer resolution of a "derivative sovereign immunity" defense until disputed facts have been determined at trial. Instead, the district court rested its denial of that defense on its purely legal determination that the United States had impliedly waived its sovereign immunity to suit for alleged violations of *jus cogens* norms. See pp. 3-4, *supra*; Pet. App. 340a. That determination was clearly wrong, but there is no reason to think it was—for the district court's purposes—anything other than "conclusive[]." *Will*, 546 U.S. at 349. There were no disputed facts that were materially relevant to the court's sovereign-immunity decision and that could be informed by an eventual trial; instead, the decision reflected the court's incorrect view that the United States can "impliedly waive[]" its sovereign immunity through conduct such as "joining the community of nations." Pet. App. 317a; but see, *e.g.*, *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980) ("A waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'") (citation omitted). Accordingly, if orders denying the pre-trial assertion of a "derivative sovereign immunity" defense satisfied the other two requirements of the collateral-order doctrine, the order here likely would have been immediately appealable. But because such orders, viewed as a category, are not effectively unreviewable on appeal after final judgment and do not address an issue completely separate from the merits, see pp. 11-14, *supra*, the court of appeals correctly determined

# H.R. 2767, TO EXTEND AU PAIR PROGRAMS

## MARKUP

BEFORE THE

### SUBCOMMITTEE ON
### INTERNATIONAL OPERATIONS AND HUMAN RIGHTS

OF THE

## COMMITTEE ON
## INTERNATIONAL RELATIONS
## HOUSE OF REPRESENTATIVES

### ONE HUNDRED FOURTH CONGRESS—

FIRST SESSION

————

DECEMBER 14, 1995

————

Printed for the use of the Committee on International Relations



U.S. GOVERNMENT PRINTING OFFICE

22–040 CC                WASHINGTON : 1996

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-052217-X

H461-24.

Appellees' Add.14

## COMMITTEE ON INTERNATIONAL RELATIONS

BENJAMIN A. GILMAN, New York, *Chairman*

| | |
|---|---|
| WILLIAM F. GOODLING, Pennsylvania | LEE H. HAMILTON, Indiana |
| JAMES A. LEACH, Iowa | SAM GEJDENSON, Connecticut |
| TOBY ROTH, Wisconsin | TOM LANTOS, California |
| HENRY J. HYDE, Illinois | ROBERT G. TORRICELLI, New Jersey |
| DOUG BEREUTER, Nebraska | HOWARD L. BERMAN, California |
| CHRISTOPHER H. SMITH, New Jersey | GARY L. ACKERMAN, New York |
| DAN BURTON, Indiana | HARRY JOHNSTON, Florida |
| JAN MEYERS, Kansas | ELIOT L. ENGEL, New York |
| ELTON GALLEGLY, California | ENI F.H. FALEOMAVAEGA, American |
| ILEANA ROS-LEHTINEN, Florida | Samoa |
| CASS BALLENGER, North Carolina | MATTHEW G. MARTINEZ, California |
| DANA ROHRABACHER, California | DONALD M. PAYNE, New Jersey |
| DONALD A. MANZULLO, Illinois | ROBERT E. ANDREWS, New Jersey |
| EDWARD R. ROYCE, California | ROBERT MENENDEZ, New Jersey |
| PETER T. KING, New York | SHERROD BROWN, Ohio |
| JAY KIM, California | CYNTHIA A. McKINNEY, Georgia |
| SAM BROWNBACK, Kansas | ALCEE L. HASTINGS, Florida |
| DAVID FUNDERBURK, North Carolina | ALBERT RUSSELL WYNN, Maryland |
| STEVEN J. CHABOT, Ohio | MICHAEL R. McNULTY, New York |
| MARSHALL "MARK" SANFORD, South | JAMES P. MORAN, Virginia |
| Carolina | VICTOR O. FRAZER, Virgin Islands (Ind.) |
| MATT SALMON, Arizona | |
| AMO HOUGHTON, New York | |

RICHARD J. GARON, *Chief of Staff*
MICHAEL H. VAN DUSEN, *Democratic Chief of Staff*

---

### SUBCOMMITTEE ON INTERNATIONAL OPERATIONS AND HUMAN RIGHTS

CHRISTOPHER H. SMITH, New Jersey, *Chairman*

| | |
|---|---|
| BENJAMIN A. GILMAN, New York | TOM LANTOS, California |
| WILLIAM F. GOODLING, Pennsylvania | CYNTHIA A. McKINNEY, Georgia |
| HENRY J. HYDE, Illinois | JAMES P. MORAN, Virginia |
| PETER T. KING, New York | HOWARD L. BERMAN, California |
| DAVID FUNDERBURK, North Carolina | ENI F.H. FALEOMAVAEGA, American |
| MATT SALMON, Arizona | Samoa |
| EDWARD R. ROYCE, California | DONALD M. PAYNE, New Jersey |

GROVER JOSEPH REES, *Subcommittee Staff Director and Chief Counsel*
ROBERT R. KING, *Democratic Professional Staff Member*
DAVID WAGNER, *Professional Staff Member*
STEPHANIE E. SCHMIDT, *Staff Associate*

(II)

# CONTENTS

## APPENDIX

H.R. 2767, to extend au pair programs ................................................................. 3
Statement submitted for the record by the Honorable Tom Lantos ..................... 5

(III)

Appellees' Add.16

# MARKUP OF H.R. 2767, TO EXTEND AU PAIR PROGRAMS

### THURSDAY, DECEMBER 14, 1995

House of Representatives,
Committee on International Relations,
Subcommittee on International Operations and Human
Rights,
*Washington, DC.*

The subcommittee met, pursuant to call, at 2:08 p.m., in room 2172, Rayburn House Office Building, Hon. Christopher Smith (chairman of the subcommittee) presiding.

Mr. Smith. The subcommittee will come to order.

We are taking up legislation relating to USIA's au pair program.

Pursuant to notice, the Chair will lay the bill before the subcommittee and the clerk will designate the title of the bill.

The Clerk. H.R. 2767, a bill to extend the United States Information Agency au pair program.

Mr. Smith. The clerk will read the bill for amendment.

The Clerk. A bill to extend the au pair program——

Mr. Smith. Without objection the bill is considered as having been read and is open for amendment at any point.

[The information appears in the Appendix.]

Mr. Smith. I will make a few comments and then yield to the distinguished chairman of the full committee, Mr. Ben Gilman, for any comments he might have and to any other members of the subcommittee.

As members know, the USIA au pair program has been an effective means of giving young people from overseas an educational year in the United States and also providing hard-working American families with many hours per week of high-quality child care.

The program operates without cost to taxpayers because the expenses of the au pair are covered by the host families.

The bill before us will extend this program for another 2 years. It will also open it up to participants from all over the world and will expand the range of agencies that can work with USIA to bring au pairs to the United States.

By enacting this authorization which has been introduced by Mr. Gilman as a freestanding bill, we can bring relief to families that were counting on the arrival of au pairs in their homes only to find that delayed by the refusal of the Senate to enact either a foreign operations bill or a foreign aid authorization bill, both of which carried riders reauthorizing the au pair program.

This bill reached us on an expedited schedule, but it should be uncontroversial.

(1)

2

I also want to note for the record that the very tireless work of Mr. Baker, Mr. Davis and Mr. Wolf have kept us on this committee very vigilant in trying to make sure that this legislation is enacted.

I would like to yield to Mr. Gilman.

Mr. GILMAN. Thank you, Mr. Chairman.

I want to thank Chairman Smith for moving this bill expeditiously. It does extend the authorization for 2 years. The Senate passed the measure last evening. I think that the Senate extended it for a 4-year period rather than 2 years. We understand the USIA supports a 4-year extension.

They believe a longer period is essential to effectively evaluate compliance of the au pair organizations with the new program regulations. I think it is a sound program and I urge our colleagues to support the measure.

Thank you.

Mr. SMITH. Thank you.

Without objection, Mr. Lantos' statement will be made a part of the record.

[The prepared statement of Mr. Lantos appears in the appendix.]

Mr. SMITH. Are there any amendments?

If there are no amendments and no further discussion, the Chair will be in receipt of a motion.

Mr. GILMAN. Mr. Chairman, I am pleased to move the subcommittee order the bill H.R. 2767, reported to the Committee on International Relations, with a recommendation that the bill do pass.

Mr. SMITH. The question is on the motion.

All those in favor say aye.

Opposed, no.

The ayes appear to have it.

The bill is passed and the motion is agreed to.

The hearing is adjourned.

[Whereupon, at 2:10 p.m., the subcommittee was adjourned.]

3

# APPENDIX

F: M4 GILMAN GILMAN.107                                    H.L.C.

104TH CONGRESS
1ST SESSION
# H. R. 2767

## IN THE HOUSE OF REPRESENTATIVES

Mr. Smith, Mrs. Morella, Mr. Davis,
Mr. Baker (CA),   Mr. Moran, & Mr. Wolf.
Mr. GILMAN (for himself, and Mr. HAMILTON) introduced the following bill;
which was referred to the Committee on _____

# A BILL

To extend au pair programs.

1    *Be it enacted by the Senate and House of Representa-*

2 *tives of the United States of America in Congress assembled,*

3 **SECTION 1. EXTENSION OF AU PAIR PROGRAMS.**

4    (a) REPEAL.—Section 8 of the Eisenhower Exchange

5 Fellowship Act of 1990 (Public Law 101–454) is repealed.

6    (b) AUTHORITY FOR AU PAIR PROGRAMS.—The Di-

7 rector of the United States Information Agency is author-

8 ized to continue to administer an au pair program, operat-

9 ing on a world-wide basis, through fiscal year 1997.

December 12, 1995 (3:53 p.m.)

Appellees' Add.19

21-1676    Document: 00117853883    Page: 83    Date Filed: 03/17/2022    Entry ID: 648

F: M4 GILMAN GILMAN.107                                    H.L.C.

2

1    (c) REPORT.—Not later than October 1, 1996, the

2  Director of the United States Information Agency shall

3  submit a report regarding the continued extension of au

4  pair programs to the Committee on Foreign Relations of

5  the Senate and the Committee on International Relations

6  of the House of Representatives. This report shall specifi-

7  cally detail the compliance of all au pair organizations

8  with regulations governing au pair programs as published

9  on February 15, 1995.

December 12, 1995 (3.53 p.m.)

5

Statement of
Congressman Tom Lantos
*Markup of H.R. 2767 — A Bill to Extend the Au Pair Program*
Subcommittee on International Operations and Human Rights
Committee on International Relations
December 13, 1995

Mr. Chairman, first of all, I want to recognize the leadership which you have shown on the question of resolving the future of the Au Pair Program. I also want to acknowledge our full committee Chairman, Congressman Ben Gilman, and our the Ranking Democratic Member of the Committee, Congressman Lee Hamilton, who have also played a critical role in dealing with this issue.

The Au Pair Program has been in a state of uncertainty for a number of years, and it has been extended temporarily several times. Because authorization for the operation of this program expired on September 30 of this year and the legislation which we have adopted to extend it has not yet passed both houses of the Congress, it is important that we act to resolve, at least temporarily again, this uncertainty for a specified period of time.

Our legislation today simply extends the program for another two years — until September 30, 1997 — without resolving the question of its ultimate fate or ultimate future structure and existence. The legislation, however, does require a report from USIA, which should provide a basis for us to take more permanent action in two years.

I welcome the improvements that are made in this legislation. In the past the Au Pair program has been limited to young people from European countries. This legislation broadens the program to include other countries in Asia, Africa, and Latin America. This expansion will create additional problems for those who

**6**

- 2 -

administer the program, but the extension of the program to all countries is a positive step, and I welcome it.

Mr. Chairman, I strongly support international educational exchange programs, including this one for Au Pairs. As the founder of the California State Universities' Study Abroad program, I have long supported and encouraged efforts to have young women and men travel and learn about other countries, other languages, and other cultures. The Au Pair program provides an important opportunity for young people to experience American culture first-hand. These are young people who generally come from families which do not have the resources to permit them to travel independently or to study at an American university. It is important that they have this personal experience of our country.

It is extremely important, however, that the USIA and those who administer this program understand that this is an educational program — its purpose is to give young people experience with our country and its culture. Families who provide a home and food for foreign young people while they are here reasonably expect some assistance with household tasks. But this is not a program to circumvent our nation's labor and immigration laws relating to employment in the United States by foreign citizens. This is not a program to provide free child-care for upper-middle class Americans. It is not a program to get around our nation's labor laws. Those laws have been written for specific purposes, and the Au Pair Program must be consistent with our labor laws. It is extremely important that the international educational exchange component of this program be recognized and acknowledged as being central to this legislation.

Mr. Chairman, I urge my colleagues to support this legislation.

○


*Education First*

# Company Fact Sheet 2016

## About EF

EF Education First is an international education company focusing on language, academics, and cultural experience. With a mission to open the world through education, EF was founded in 1965. In the following section, you will find descriptions of EF's different businesses.

## Facts at a glance

| | |
|---|---|
| Company Name | EF Education First (abbreviated to EF) |
| Founded | 1965 in Lund, Sweden |
| Owner | Privately held by EF's founder Bertil Hult and family |
| Headquarters | Lucerne, Switzerland |
| Schools and Offices | 500 in 53 countries |
| Global presence | 112 countries |
| Employees | 43,500 (19,500 office staff, 6,000 full time faculty, 18,000 part time teachers) |

## Company Overview

**Divisions and Business Units**

EF Education First is organized in three divisions: EF Language and Schools, EF Cultural Exchange, and EF Educational Travel. Each division has several different businesses.

**EF Language and Schools**

- EF Learning Labs
- EF English Live
- EF Local English Language Centers
- EF Local English Language Centers for Kids
- EF International Language Centers
- EF Corporate Solutions
- EF Academy—International Boarding Schools

**EF Cultural Exchange**

- EF High School Exchange Year
- Cultural Care Au Pair

**EF Educational Travel**

- EF Explore America
- EF Educational Tours
- EF College Study Tours
- EF College Break
- EF Go Ahead Tours

**Affiliated Organizations**

EF is also affiliated with an independent, not-for-profit business school, Hult International Business School, and an independent not-for-profit exchange program, EF Foundation, as well as an insurance company, Erika Insurance.

**Hult International Business School**

- Undergraduate Programs
- Graduate Programs
- Ashridge Executive Education

**Erika Insurance**

Travel Insurance