No. 21-1676

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

KAREN MORALES POSADA; AMANDA SARMENTO FERREIRA
GUIMARAES; WILLIANA ROCHA; SARA BARRIENTOS, individually and on
behalf of all other similarly situated,

*Plaintiffs-Appellees*,

v.

CULTURAL CARE, INC., a Massachusetts Corporation,
*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Massachusetts
(Case No. 1:20-cv-11862-IT)

**BRIEF OF NATIONAL DOMESTIC WORKERS ALLIANCE, NATIONAL
EMPLOYMENT LAW PROJECT, AND ECONOMIC POLICY INSTITUTE AS *AMICI
CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Dawn L. Smalls
   *Counsel of Record*
JENNER & BLOCK LLP
919 Third Ave.
New York, NY 10022
(212) 891-1600
dsmalls@jenner.com

Ann O'Leary
JENNER & BLOCK LLP
455 Market Street
Suite 2100
San Francisco, CA 94105
(628) 267-6800

Illyana A. Green
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici curiae* National Domestic Workers Alliance, the National Employment Law Project, and the Economic Policy Institute state that they are all not-for-profit associations, with no corporate parent, and no publicly owned corporation owns more than 10% of its stock (as the *amici* issue no stock).

Date:  March 21, 2022

/s/ *Dawn L. Smalls*
Dawn L. Smalls

## RULE 29 STATEMENTS

This brief is filed with the consent of all parties pursuant to Federal Rule of Appellate Procedure 29(a)(2).  No part of this brief was authored, in whole or in part, by counsel for any party.  No person, including but not limited to any party or party's counsel, other than amici, contributed any money to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(a)(4)(E).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................... i

RULE 29 STATEMENTS ....................................................... ii

IDENTITY AND INTEREST OF AMICI CURIAE ...............................1

SUMMARY OF ARGUMENT ...............................................3

ARGUMENT ....................................................................5

I.     The Federal Au Pair Program Neither Shields Sponsor Organizations From Suit, Nor Preempts Application Of State And Local Wage Laws. .................................................................5

       A.     Cultural Care Is Not Entitled to Derivative Sovereign Immunity. ................................................... 5

       B.     The Minimum Wage Laws and Employee Protections Are Not Preempted By State Department Regulation....................................... 7

II.    The Federal Au Pair Program is, Fundamentally, a Work Program. ............10

III.   The Cultural Exchange Objectives of the Federal Au Pair Program Are Not Inconsistent with State Labor Protections. ......................................15

IV.    Exempting Sponsor Organizations From Complying With State And Local Employment Laws Has Significant Implications For The U.S. Labor Market. .................................................17

       A.     Exempting In-home Childcare Workers On J-1 Au Pair Visas From State And Local Employment Laws May Depress Working Conditions For Other Domestic Workers. .......................... 19

CONCLUSION ....................................................................24

CERTIFICATE OF COMPLIANCE .......................................................25

# TABLE OF AUTHORITIES

## CASES

*Beltran v. InterExchange Inc.*, No. 14-cv-03074, 2016 WL 695967 (D. Colo. Feb. 22, 2016), *report and recommendation adopted in part, rejected in part*, 176 F. Supp. 3d 1066 (D. Colo. 2016)...................................7, 8

*Betancourt v. Cultural Care, Inc.*, Case No. 2081CV0056 (Mass. Nov. 16, 2020) ...........................................................................................8

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016)................................................7

*Capron v. Office of Attorney General of Massachusetts*, 944 F.3d 9 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 150 (2020) ....................................7, 8, 9, 15

*Cunningham v. General Dynamics Information Technology Inc.*, 888 F.3d 640 (4th Cir. 2018) ......................................................................7

*Kudlacz v. Cultural Care, Inc.*, Case No. CGC-20-584567 (Cal. Sept. 3, 2020) ...........................................................................................8

*Padron v. GreatAuPair, LLC*, Case No. CGC-20-587057 (Cal. Feb. 16, 2021) ...........................................................................................8

*Pettis Moving Co. v. Roberts*, 784 F.2d 439 (2d Cir. 1986) ....................................8

*Williamson v. General Dynamics Corp.*, 208 F.3d 1144 (9th Cir. 2000) ...........................................................................................8

## STATUTES

9 U.S.C. § 203 ....................................................................................7

21 U.S.C. § 360bbb-3...........................................................................6

22 U.S.C. § 2451 ............................................................................15, 16

29 U.S.C. § 218.............................................................................8, 16

Au Pair Programs, Extension, Pub. L. No. 104-72, 109 Stat. 776 (1995).........................................................................................16

**LEGISLATIVE MATERIALS**

*From Excluded to Essential: Tracing the Racist Exclusion of Farmworkers, Domestic Workers, and Tipped Workers from the Fair Labor Standards Act: Hearing Before the Subcom. on Workforce Protections of the H. Comm. on Education and Labor*, 117th Cong. (2021) (statement from Rebecca Dixon, Nat'l Employment Law Project), https://edlabor.house.gov/imo/media/doc/DixonRebeccaTestimony050321.pdf ..........................................................18

*From Excluded to Essential: Tracing the Racist Exclusion of Farmworkers, Domestic Workers, and Tipped Workers from the Fair Labor Standards Act: Hearing Before the Subcom. on Workforce Protections of the H. Comm. on Education and Labor*, 117th Cong. (2021) (statement from Haeyoung Yoon, Nat'l Domestic Workers Alliance), https://edlabor.house.gov/imo/media/doc/YoonHaeyoungTestimony050321.pdf........................................................18

**OTHER AUTHORITIES**

12 C.F.R. § 5.20 ..........................................................................................6

20 C.F.R. § 655.0 ...............................................................................20, 21

22 C.F.R. § 62.2 ..........................................................................................5

22 C.F.R. § 62.3 ..........................................................................................5

22 C.F.R. § 62.9 .....................................................................................5, 6

22 C.F.R. § 62.10 ...................................................................................5, 9

22 C.F.R. § 62.11 ........................................................................................9

22 C.F.R. §§ 62.20-62.32..........................................................................16

22 C.F.R. § 62.31 .............................................................................*passim*

22 C.F.R § 62.32 ......................................................................................16

Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 86 Fed. Reg. 68,174 (Jan. 31, 2022) ..........................22, 23

Chris Bibey, *How Much Should You Pay Your Nanny?*, SurePayRoll (May 6, 2020), https://bit.ly/3u2Dv1i .................................................. 11

David J. Bier, *Facts About the Summer Work and Travel Program*, CATO Inst. (May 27, 2020), https://bit.ly/3ilMIfM ........................... 17

Janie A. Chuang, *The U.S. Au Pair Program: Labor Exploitation and the Myth of Cultural Exchange*, 36 Harv. J.L. & Gender 269 (2013) .................................................................................... 12, 13, 19

Daniel Costa, *EPI Comments on DOL's Proposed Changes to the Adverse Effect Wage Rate Methodology for H-2A Visas for Temporary Migrant Farmworkers*, Econ. Pol'y Inst. (Jan. 31, 2022), https://bit.ly/3ifTpjE ........................................................... 21

Daniel Costa, *Guestworker Diplomacy: J Visas Receive Minimal Oversight Despite Significant Implications for the U.S. Labor Market*, Econ. Pol'y Inst. Briefing Paper No. 317 (July 14, 2011), https://bit.ly/3wrecsy ............................................................ 20

Cultural Care Au Pair, *Au Pairs and household help: what and how much is ok?* (Mar. 31, 2014), https://bit.ly/3KYOI9Y ................................ 10, 12

Cultural Care Au Pair, *Fact or Fiction? My Au Pair Can Teach My Children a Foreign Language* (Apr. 8, 2013), https://bit.ly/3tl676P ................. 11

Cultural Care Au Pair, *Frequently Asked Questions: What does an au pair do?*, https://bit.ly/3JjOkCG ...................................................... 10

Cultural Care Au Pair, *Frequently Asked Questions: What happens if it doesn't work out with my au pair?*, https://bit.ly/3JjOkCG (last visited Mar. 15, 2022) .......................................................... 13

EurekaFacts, LLC, *Au Pair Program: 2020 Review Report* (2020), https://www.alliance-exchange.org/wp-content/uploads/2020/10/EF_AuPairReport_2020.pdf ................................................ 19

Exchange Visitor Program, 60 Fed. Reg. 8547 (Feb. 15, 1995) ................. 14, 15, 16

Exchange Visitor Program, 62 Fed. Reg. 34,632 (June 27, 1997) ........................ 14

Exchange Visitor Program—Summer Work Travel, 76 Fed. Reg. 23177 (Apr. 26, 2011) ................................................................ 16-17

vi

Joan Lowell, *Au Pair Job Duties and Responsibilities*, Go AuPair (Apr. 23, 2019), https://bit.ly/3u4PHie ........................................................................11

Sabrina Moreno, *Au Pairs a Lifeline for Virginia Families as Schools Reopen*, Wash. Post (Aug. 16, 2020), https://wapo.st/3wjE5uo.................11, 12

Nat'l Domestic Workers Alliance et al., *Home Economics: The Invisible and Unregulated World of Domestic Work* 8 (2012), https://bit.ly/3qllCKb ...............................................................17

Nat'l Domestic Workers Alliance et al., *Shortchanged: The Big Business Behind the Low Wage J-1 Au Pair Program* (2018), https://bit.ly/37JRlhR .....................................................12, 13

U.S. Dep't of State, *The Au Pair Exchange Program Brochure* (Oct. 2011), https://bit.ly/3u8vU1h.................................................................12

U.S. Gen. Acct. Off., GAO/NSIAD-90-61, *Inappropriate Uses of Educational and Cultural Exchange Visas* (1990), https://bit.ly/3CVfUnB ..............................................................13, 14

U.S. Dep't of Labor, *Prevailing Wage Information and Resources*, https://bit.ly/3u8O4QG (last visited Mar. 18, 2022) ..........................................22

U.S. Off. of Inspections, Report No. ISP-I-12-15, *Inspection of the Bureau of Educational and Cultural Affairs* (2012), https://bit.ly/3ik8Fff.............................................................14

Julia Wolfe et al., *Domestic Workers Chartbook*, Econ. Pol'y Inst. (May 14, 2020), https://bit.ly/3KYUxEm...........................................................17

**IDENTITY AND INTEREST OF AMICI CURIAE**

The National Domestic Workers Alliance ("NDWA") is the nation's leading advocacy organization advancing the dignity, rights, and recognition of 2.2 million domestic workers who provide in-home childcare, other caregiving, and housecleaning services in private homes.  NDWA is powered by sixty-five affiliates, plus local chapters in Georgia, North Carolina, New York, Pennsylvania, and Houston of nannies, housecleaners, and home care workers in 21 states.  Domestic workers continue to be excluded from some of the core workplace laws at the federal and state levels.  NDWA fights for improved standards and treatment for every single worker in the domestic work sector.

The National Employment Law Project ("NELP") is a non-profit legal organization with over fifty years of experience advocating for the employment and labor rights of low-wage workers.  In partnership with community groups, unions, and state and federal public agencies, NELP seeks to ensure that all employees, and especially those more susceptible to exclusion, receive the basic workplace protections guaranteed in our nation's labor and employment laws.  NELP's Fair Pay for Caregivers campaign seeks to ensure fair pay for all care workers, and quality of care for all.  NELP has litigated and participated as amicus in numerous cases addressing the rights of home care and other domestic workers under state and federal wage and hour laws.

The Economic Policy Institute ("EPI") is a nonprofit, nonpartisan think tank created in 1986 to include the needs of low- and middle-income workers in economic policy discussions. EPI has 35 years of experience analyzing the effects of economic policy on the lives of American working families. EPI has studied and produced extensive research on the economic implications of wage and hour issues under the Fair Labor Standards Act, as well as on state minimum wage laws, and the in-home care workforce. For example, EPI published a November 2021 report, *Setting Higher Wages For Child Care And Home Health Care Workers Is Long Overdue*. EPI has also researched, written, and commented extensively on the U.S. system for labor migration, through public comments, publications, and testimony—including with respect to U.S. immigrant and nonimmigrant visas, including the J-1 visa program. In 2011, EPI published the first report to ever examine the impact of the J-1 visa program on the U.S. labor market, entitled *Guestworker Diplomacy*, and since then has authored numerous other reports, blog posts, and public comments to regulations.

## SUMMARY OF ARGUMENT

For thirty-five years the federal government has presided over the J-1 au pair program, which allows foreign nationals between the ages of 18 and 26 to enter the United States and reside with an American host family for up to two years. Au pairs generally provide forty-five hours of in-home childcare services per week, and complete coursework at a local college or university. *See* 22 C.F.R. § 62.31(a), (c)(1), (d), (o). Most of an au pair's time in the United States is spent performing in-home childcare work in exchange for a weekly stipend. At its core, therefore, the federal au pair program is a work program. Accordingly, in-home childcare workers on J-1 visas should be afforded the protection of federal, state, and local employment laws.

Sponsor organizations champion the cultural exchange aspect of the J-1 au pair program as a means of minimizing the work component of the program. However, the cultural exchange objectives of the federal au pair program are not inconsistent with state and local labor laws. In fact, the federal government has long recognized J-1 au pairs as both cultural exchange visitors and protected employees. Neither goal diminishes the other.

Indeed, not acknowledging that in-home childcare workers on J-1 visas are workers who should be subject to state and local employment laws may have negative implications for the American labor market. Au pairs represent a segment

of the domestic work market that is paid substantially less than the prevailing wage obtained by similarly situated workers in the private domestic work market. That distinction encourages discrimination against private domestic workers, in effect making them a second choice sought only if an in-home childcare worker on a J-1 visa is unavailable. Requiring sponsor organizations to set wages for au pairs in compliance with state and local minimum wage laws will begin to close the gap between in-home childcare workers on J-1 visas and other domestic workers. Closing the wage gap between these two groups of in-home workers will help ensure that the J-1 au pair program does not adversely affect the American labor market—while continuing to support the diplomatic goals of the program.

For these reasons, Amici urge this Court to affirm the district court's holding and dismiss Cultural Care's appeal.

## ARGUMENT

I.  **The Federal Au Pair Program Neither Shields Sponsor Organizations From Suit, Nor Preempts Application Of State And Local Wage Laws.**

A.  **Cultural Care Is Not Entitled to Derivative Sovereign Immunity.**

The district court was correct to conclude that sponsor organizations such as Cultural Care are not agents of the federal government entitled to derivative sovereign immunity.  The State Department is charged with administering au pair exchange programs.  Sponsors of the federal au pair program are private placement agencies that generally operate for profit and are "designated by the Secretary of State to conduct an exchange visitor program."  22 C.F.R. § 62.2; *see also id.* §§ 62.3, 62.31(c) (providing that exchange visitor programs are "conduct[ed]" by "[s]ponsors").  These organizations in turn are "responsible for the effective administration of their exchange visitor program(s)." *Id.* § 62.10.

Notwithstanding Appellants' arguments, the fact that sponsor organizations are designated by the State Department and subject to regulation is not enough, on its own, to render these organizations contractors or agents of the federal government.  Indeed, the State Department regulations themselves foreclose any such implication as they mandate that J-1 sponsors do "[n]ot represent that its exchange visitor program is endorsed, sponsored, or supported by the Department of State or the United States Government."  22 C.F.R. § 62.9(d)(5).  Further, unlike government agents or contractors, sponsor organizations have no contractual

5

relationship with the federal government.  While State Department regulations do require sponsors to meet certain standards of performance, including remaining in compliance with "all local, state, and federal laws, and professional requirements," *id.* § 62.9(c), this is consistent with many regulatory requirements imposed on other federally regulated entities such as an entity licensed to establish a federally chartered bank, *see* 12 C.F.R. § 5.20, or pharmaceutical companies authorized to market a drug for emergency use, *see* 21 U.S.C. § 360bbb-3.

Cultural Care's decision to become a sponsor organization triggers the regulatory requirements.  *See Morales Posada v. Cultural Care, Inc.*, No. 20-CV-11862, __ F. Supp. 3d __, 2021 WL 3604884, at *6 (D. Mass. Aug. 13, 2021) (holding that "Cultural Care was not *hired* by the government to perform certain tasks; it *voluntarily* decided to apply to be a sponsor organization" and thus was required to comply with "the applicable regulations" (emphasis added)).  Its designation as a sponsor organization creates no more attachment to the federal government than any other federally regulated entity has.

As private entities that do not contract with or serve as agents of the federal government, sponsor organizations are not entitled to derivative sovereign immunity.  The doctrine of derivative sovereign immunity extends government immunity—usually from tort liability—to government contractors whose actions were undertaken on behalf of the federal government under a validly awarded

contract. *See Cunningham v. Gen. Dynamics Info. Tech. Inc.*, 888 F.3d 640, 646-47 (4th Cir. 2018) (citing *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940)); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166-67 (2016). No such contractual relationship exists here.

Even if the Court were inclined to stretch the doctrine beyond the limits of Supreme Court precedent, that alone is insufficient to render Cultural Care immune from suit. Derivative sovereign immunity can only extend as far as the sovereign's own immunity from suit, and the federal government has waived sovereign immunity to permit suit against public agencies under the Fair Labor Standards Act. *See* 29 U.S.C. § 203(d), (e)(2)(A)(ii) (expressly consenting to suit under the FLSA for "any individual employed by the Government of the United States . . . in any executive agency").

## B. The Minimum Wage Laws and Employee Protections Are Not Preempted By State Department Regulation.

This Court should join the five trial and appellate courts that have recently rejected similar arguments advanced by sponsor organizations like Cultural Care, that minimum wage laws and employee protections are preempted by State Department regulation. *See Capron v. Off. of Att'y Gen. of Mass.*, 944 F.3d 9, 44 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 150 (2020); *Beltran v. InterExchange Inc.*, No. 14-cv-03074, 2016 WL 695967, at *13–14 (D. Colo. Feb. 22, 2016), *report and recommendation adopted in part, rejected in part*, 176 F. Supp. 3d 1066, 1084 (D.

Colo. 2016) (finding no preemption); *Betancourt v. Cultural Care, Inc*., Case No. 2081CV0056 (Mass. Nov. 16, 2020); *Kudlacz v. Cultural Care, Inc.*, Case No. CGC-20-584567 (Cal. Sept. 3, 2020); *Padron v. GreatAuPair, LLC*, Case No. CGC-20-587057 (Cal. Feb. 16, 2021).

*First*, the State Department's au pair regulations explicitly incorporate the FLSA, which in turn explicitly incorporates state wage and hour laws. *See* 22 C.F.R. § 62.31(j)(1) (requiring sponsor organizations to adhere to the FLSA); *see also* 29 U.S.C. § 218 (savings provision expressly allowing state and local wage laws to override the FLSA). And courts have uniformly interpreted the FLSA to mean what it says: that states retain the prerogative to afford their workers greater protections. *See, e.g.*, *Pettis Moving Co. v. Roberts*, 784 F.2d 439, 441 (2d Cir. 1986); *Williamson v. General Dynamics Corp*., 208 F.3d 1144, 1151 (9th Cir. 2000).

*Second*, the State Department regulations do not impliedly preempt the field of state minimum wage laws. The First Circuit has already so held regarding host families. *See Capron*, 944 F.3d at 24. Here, the au pair regulations do not preclude the possibility of state supplementation. To the contrary, the regulations expressly contemplate concurrent compliance with state and local wage laws. Indeed, in addition to requiring that sponsors follow FLSA standards, *see* 29 U.S.C. § 218(a), the regulations contemplate the following: that (i) sponsor organizations employ persons who have "a detailed knowledge of federal, state, and local laws pertaining

to employment, including the [FLSA]," 22 C.F.R. § 62.11(a); (ii) sponsors provide au pairs with information on "employee rights and laws, including workman's compensation," § 62.10(b)(9); and (iii) sponsors offer *au pairs* information concerning the Wilberforce Pamphlet on the Rights and Protections for Temporary Workers, which includes the proviso that *au pairs* may be eligible for more protections under state law, *see* § 62.10(c)(8).

*Third*, the State Department regulations do not impliedly preempt state minimum wage laws under the doctrine of conflict preemption. As demonstrated above, the *au pair* program regulations expressly contemplate simultaneous compliance with state and local law, and nothing in those regulations would prevent an au pair from being paid a legal wage under state law. The First Circuit has already rejected the idea that applying state wage laws to the au pair program impedes the government's foreign affairs interests.[1]

The federal au pair program regulations, therefore, do not grant sponsor organizations immunity from suit as agents of the government nor do they preempt the application of state and local wage laws.

---

[1] In *Capron*, the First Circuit concluded that no part of the Department of State regulations suggests "an agency interest in capping, based on the FLSA minimum wage, the costs of a host family that chooses to have an au pair participant provide the full amount of childcare services that the Au Pair Program allows." *See Capron*, 944 F.3d at 30.

## II.    The Federal Au Pair Program is, Fundamentally, a Work Program.

While the goal of the program is to allow young foreign nationals the experience of living in the United States with an American family, fundamentally, au pairs are full-time child-care providers—and should be compensated as such. Often working 45 hours per week, au pairs care for children, tutor them, prepare meals, and clean. They do so at the hours dictated by their host family. Further, their time to take advantage of classes or cultural activities—promoted to the au pairs as benefits of the program—is contingent on the needs and requirements of their host family.

Cultural Care tells families that an au pair's role includes driving children to and from school and extracurricular activities; preparing meals for children; looking after their belongings; making children's beds; doing their laundry; straightening out their rooms; cleaning up after them; playing with them; and assisting with homework. *See* Cultural Care Au Pair, *Au Pairs and household help: what and how much is ok?* (Mar. 31, 2014), https://bit.ly/3KYOI9Y ("Cultural Care Au Pair, *Au Pairs and household help*"); Cultural Care Au Pair, *Frequently Asked Questions: What does an au pair do?*, https://bit.ly/3JjOkCG (last visited Mar. 15, 2022). Because au pairs provide care to all children within the household, many au pairs care for infants, young children, or children with special needs—who may require

10

additional attention.[2]  And many au pairs care for several children at once without additional pay:  Unlike nannies, their compensation is generally the same regardless of how many children they care for.[3]

Au pairs are also expected to provide various forms of cultural enrichment. For example, au pairs may be tasked with teaching children foreign languages, sharing cultural practices with them, or showing them how to prepare cultural meals. *See* Cultural Care Au Pair, *Fact or Fiction? My Au Pair Can Teach My Children a Foreign Language* (Apr. 8, 2013), https://bit.ly/3tl676P.  As another au pair sponsor agency conceded, "other forms of childcare would charge extra for this level of enrichment."  *See* Joan Lowell, *Au Pair Job Duties and Responsibilities*, Go AuPair (Apr. 23, 2019), https://bit.ly/3u4PHie.

During COVID, au pairs took on an even broader set of responsibilities.  They became "teachers, housekeepers, childcare workers, play dates—the engine that ke[pt] the house running as schools closed and life halted."  Sabrina Moreno, *Au Pairs a Lifeline for Virginia Families as Schools Reopen*, Wash. Post (Aug. 16, 2020), https://wapo.st/3wjE5uo.  Some au pairs supervised remote learning with

---

[2] Au pairs must satisfy certain criteria to be placed with host families with infants, young children, or special needs children.  *See* 22 C.F.R. § 62.31(e)(2)–(4).

[3] *Compare* 22 C.F.R. § 62.31(j) (providing for uniform compensation for all au pair childcare providers), *with* Chris Bibey, *How Much Should You Pay Your Nanny?*, SurePayRoll (May 6, 2020), https://bit.ly/3u2Dv1i (discussing the common practice of raising nannies' compensation 20% for each additional child).

children who struggled to pay attention online. *Id.* That meant that the previous breaks that au pairs had when children were at school were replaced with constant activities to keep them occupied—a particular challenge when entertainment venues such as pools and museums closed. *Id.*

In addition to providing full-time childcare, au pairs also perform significant housekeeping work. Although au pair regulations provide that au pairs are not meant to serve as general housekeepers or assume the role of household management,[4] au pairs regularly report performing housekeeping duties beyond the scope of their legally defined employment. *See* Nat'l Domestic Workers Alliance et al., *Shortchanged: The Big Business Behind the Low Wage J-1 Au Pair Program* (2018), https://bit.ly/37JRlhR ("*Shortchanged: The Big Business Behind the Low Wage*"). In interviews, au pairs have reported that they are expected "to work as a maid"— even when their host families are home, *id.* at 9, and "clean[] and cook[] for the entire family", *id.* at 5. Such responsibilities go well beyond "help with household duties related to the kids" advertised to the au pairs. *See* Cultural Care Au Pair, *Au pairs and household help*. Further, many au pairs are assigned additional responsibilities as "household members" rather than as laborers—such as taking out the trash and dishwashing. *See* Janie A. Chuang, *The U.S. Au Pair Program: Labor*

---

[4] *See* U.S. Dep't of State, *The Au Pair Exchange Program Brochure* (Oct. 2011), https://bit.ly/3u8vU1h.

*Exploitation and the Myth of Cultural Exchange*, 36 Harv. J.L. & Gender 269, 290 (2013).[5]  If an au pair fails to meet host family expectations, the host family can request that Cultural Care replace the au pair.  *See* Cultural Care Au Pair, *Frequently Asked Questions: What happens if it doesn't work out with my au pair?*, https://bit.ly/3JjOkCG (last visited Mar. 15, 2022).

All in, au pairs spend the majority of their hours working.  Although State Department regulations provide that "[a]u pair participants provide up to forty-five hours of child care services per week," 22 C.F.R. § 62.31(a), forty-five hours is the general standard.  Some au pairs report that their hours even exceed this ceiling and that their work schedules are so demanding that they "compromise their ability to participate in meaningful cultural activities or meet their academic requirement[s]." *See Shortchanged: The Big Business Behind the Low Wage* at 4-5.  As the GAO noted over three decades ago, the au pair program is "essentially [a] child care work program[.]"  U.S. Gen. Acct. Off., GAO/NSIAD-90-61, *Inappropriate Uses of Educational and Cultural Exchange Visas* 20 (1990), https://bit.ly/3CVfUnB.  "As currently structured, au pair programs would normally be subject to Department of

---

[5] The idea that au pairs are members of the family rather than workers is often used to recast au pairs' work as "helping out." For example, an au pair relaxing in the shared living room who agrees to watch the baby while the employer takes a quick late-night phone call might easily be construed as "helping" rather than "working." *See* Chuang, *The U.S. Au Pair Program: Labor Exploitation and the Myth of Cultural Exchange*, 36 Harv. J.L. & Gender at 328–29.

Labor administrative review and certification." *Id.*[6] Thus, it is clear that work is the central focus of the au pair program.

The au pair program's legislative history confirms that it is a work program. In the 1995 regulations, USIA "sought the views and guidance of the Department of Labor" on the issue of whether "au pairs are employees subject to the provisions" of FLSA. Exchange Visitor Program, 60 Fed. Reg. 8547, 8550 (Feb. 15, 1995). The Department of Labor "specifically advised the Agency that an employment relationship is established." *Id.* And USIA found it appropriate "to defer to Department of Labor in this area." *Id.* USIA then set forth an analysis of why au pairs are "employees" under FLSA. *Id.* In 1997, USIA issued a final set of regulations that abandoned the previous minimum weekly stipend for au pairs, and instead provided that au pairs would be "compensated at a weekly rate based upon 45 hours per week and paid in conformance with the requirements of the [FLSA] as interpreted and implemented by the United States Department of Labor." Exchange Visitor Program, 62 Fed. Reg. 34,632, 34,634 (June 27, 1997). This rule is now codified in current State Department regulations. 22 C.F.R. § 62.31(j)(1). In short,

---

[6] A more recent report by the United States Department of State and the Broadcasting Board of Governors Office of Inspector General questioned the "appropriateness of using J visas in work programs such as . . . [the] au pair[ program]." U.S. Off. of Inspections, Report No. ISP-I-12-15, *Inspection of the Bureau of Educational and Cultural Affairs* 24 (2012), https://bit.ly/3ik8Fff.

the federal government has consistently recognized that au pairs are employees, subject to labor laws.

### III. The Cultural Exchange Objectives of the Federal Au Pair Program Are Not Inconsistent with State Labor Protections.

As a cultural exchange program under the Fulbright-Hays Act, the federal au pair program is designed to "promote international cooperation" and "assist in the development of friendly, sympathetic, and peaceful relations between the United States and . . . other countries." 22 U.S.C. § 2451. In no way are these goals incompatible with state worker-protection laws.

As the First Circuit has observed, "[i]t is hardly evident that a federal … interest in creating a 'friendly' and 'cooperative' spirit with other nations is advanced by a program … that, by design, would authorize foreign nationals to be paid less than Americans performing similar work." *Capron*, 944 F.3d at 26 (quoting 22 U.S.C. § 2451). When the United States invites citizens of other countries to experience American values and culture, part of that experience includes respecting our labor laws and workplace culture.

In fact, federal law has long treated au pairs as **both** cultural exchange visitors and protected employees. *See, e.g.*, 60 Fed. Reg. at 8550 (explaining that au pairs have "employee status" and "an employment relationship" with host family employers). Indeed, when Congress reauthorized the au pair program in 1995, it did so on the condition that sponsors comply with USIA's regulations recognizing au

15

pairs as employees.  *See* Au Pair Programs, Extension, Pub. L. No. 104-72, 109 Stat. 776 (1995).[7]  Today, state department regulations explicitly incorporate the FLSA, which in turn explicitly incorporates state wage and hour laws.  *See* 22 C.F.R. § 62.31(j)(1); 29 U.S.C. § 218.  In sum, the federal government has consistently recognized:  employment protections and cultural exchange are not mutually exclusive.

Other J-1 programs also demonstrate that worker protections are consistent with cultural exchange.  Since 1961, the federal government has operated numerous cultural exchange programs under the Fulbright Hays Act. 22 U.S.C. § 2451.  These programs currently include: high school student and teacher exchanges, university student and professor exchanges, training and internship programs, summer work travel programs, and more.  *See* 22 C.F.R. §§ 62.20-62.32.  J-1 participants who come to the United States for work have historically been treated as employees and have received state minimum wage protections.  *See, e.g.*, 22 C.F.R § 62.32(i)(1) (summer work travel participants subject to state minimum wage laws).  These protections have not come at the expense of the program's cultural goals.  *See, e.g.*, Exchange Visitor Program—Summer Work Travel, 76 Fed. Reg. 23,177, 23,177

---

[7] The USIA regulations were themselves promulgated in response to concerns that the au pair program "displace[d] American workers and amount[ed] to no more than the import of cheap foreign labor in the guise of an educational and cultural program." 60 Fed. Reg. at 8550.

(Apr. 26, 2011) ("Summer Work Travel exchange programs have been a cornerstone of U.S. public diplomacy efforts for nearly 50 years."); David J. Bier, *Facts About the Summer Work and Travel Program*, CATO Inst. (May 27, 2020), https://bit.ly/3ilMIfM (detailing the program's benefits). Thus, this Court need not accept the false dichotomy that au pairs (or other J1 visa holders) are *either* workers or cultural exchange participants. They can be—and indeed are—both.

## IV. Exempting Sponsor Organizations From Complying With State And Local Employment Laws Has Significant Implications For The U.S. Labor Market.

Domestic workers are critical to the United States economy. Yet, despite their central role in the American labor market, domestic workers have historically been excluded from protections afforded to other groups of American workers. *See* Nat'l Domestic Workers Alliance et al., *Home Economics: The Invisible and Unregulated World of Domestic Work* 8 (2012), https://bit.ly/3qllCKb. That policy decision dates back to the New Deal, when majority-Black domestic workers and farmworkers were excluded from landmark federal labor laws as a concession to Southern lawmakers. *See id.*[8] Though strides have been made to ensure that domestic workers

---

[8]*See also* Julia Wolfe et al., *Domestic Workers Chartbook*, Econ. Pol'y Inst. (May 14, 2020), https://bit.ly/3KYUxEm (explaining that exclusions for domestic workers carried through to subsequent worker protection statutes). Gains in worker protection measures for domestic workers have been hard fought and have only been recently obtained. Entrenched societal attitudes towards domestic work have made it difficult to improve the sector. As a result, the domestic labor market still lags behind other segments of the American labor market in terms of wage rates and

receive protection under federal, state and local law, they remain a marginalized group within the American labor market.  It is important that these legal protections apply to all domestic workers, including those in the United States pursuant to a J-1 visa.

As explained above, *see supra* 9–14, in-home childcare workers on J-1 au pair visas perform domestic labor.  In fact, au pairs are often tasked with the same childcare and household responsibilities as private domestic workers, such as nannies and home care workers, who also work similar hours per week.  The primary difference between these two groups is that in-home childcare workers on J-1 au pair visas are compensated for that labor at a much lower rate than other domestic workers whose wages are guided by state and local employment laws.  The inequity

---

worker protections.  *See From Excluded to Essential: Tracing the Racist Exclusion of Farmworkers, Domestic Workers, and Tipped Workers from the Fair Labor Standards Act: Hearing Before the Subcom. on Workforce Protections of the H. Comm. on Education and Labor*, 117th Cong. 3–10 (2021) (statement from Rebecca Dixon, , Nat'l Employment Law Project), https://edlabor.house.gov/imo/media/doc/DixonRebeccaTestimony050321.pdf, (chronicling the direct historical line from the FLSA exclusions to modern racial wealth gap for in-home domestic workers); *From Excluded to Essential: Tracing the Racist Exclusion of Farmworkers, Domestic Workers, and Tipped Workers from the Fair Labor Standards Act: Hearing Before the Subcom. on Workforce Protections of the H. Comm. on Education and Labor*, 117th Cong. 4–8 (2021) (statement from Haeyoung Yoon, Nat'l Domestic Workers Alliance),        https://edlabor.house.gov/imo/media/doc/YoonHaeyoungTestimony 050321.pdf (charting recent gains for domestic workers as well as the impact and legacy of the FLSA exclusions).

between au pair stipends and private domestic worker wages has negative implications for the domestic labor market in the United States.

**A.    Exempting In-home Childcare Workers On J-1 Au Pair Visas From State And Local Employment Laws May Depress Working Conditions For Other Domestic Workers.**

The au pair program is a segment of the domestic work market that is paid substantially less than the prevailing wage obtained by similarly situated workers in the private domestic work market. *See* Chuang, *The U.S. Au Pair Program: Labor Exploitation and the Myth of Cultural Exchange*, 36 Harv. J.L. & Gender at 317 (using "private" in this context to mean hiring a childcare professional through the marketplace, whether directly or through a private childcare provider).[9] If this continues, families will have little incentive to offer employment to private domestic workers —who must be paid higher wages and receive health care benefits, which have federal and state payroll tax consequences—when in-home childcare workers on J-1 visas can perform the same tasks for a fraction of the cost and with none of the attendant worker protections.[10]  That in turn encourages discrimination against

---

[9] A survey of over 6,000 families who relied on the federal au pair program explained that "[w]ithout the au pair program, most host families believe it is likely they would spend more money on childcare (84%), including two-thirds (66%) who believe it is 'extremely likely' this would be the case."  EurekaFacts, LLC, *Au Pair Program: 2020 Review Report* 56 (2020), https://www.alliance-exchange.org/wp-content/uploads/2020/10/EF_AuPairReport_2020.pdf.

[10] Sponsor organizations like Cultural Care recruit, supervise, train, terminate, handle disputes and grievances, and set the terms and conditions of employment for au pairs.  Though the State Department regulations require that au pairs be

private domestic workers, in effect making them a second choice sought only if an in-home childcare worker on a J-1 visa is unavailable. Further, because sponsor organizations and host families are not required under the current program to provide comparable wages or to advertise their job openings, as guestworker visa programs require, many private domestic workers do not know of or are not provided an opportunity to apply for positions with host families. *See* Daniel Costa, *Guestworker Diplomacy: J Visas Receive Minimal Oversight Despite Significant Implications for the U.S. Labor Market*, Econ. Pol'y Inst. Briefing Paper No. 317 (July 14, 2011), https://bit.ly/3wrecsy.

Because childcare workers operate under the J-1 regulations and not the guestworker visa regulations governed by the Department of Labor, no comprehensive economic analysis of the effect of au pair labor on the domestic labor market in the United States has been undertaken. With respect to guest workers, the Immigration and Nationality Act (INA) requires that the hiring of a foreign worker will not adversely affect the wages and working conditions of American workers comparably employed. *See* 20 C.F.R. § 655.0(a). To comply with the statute, the

---

"compensated at a weekly rate," 22 C.F.R. § 62.31(j)(1), the regulations set neither an upper limit for the stipend nor a required amount. Instead, sponsor organizations like Cultural Care set wages, and choose not to follow state and local minimum wage laws to determine what stipend should be offered to childcare workers on J-1 au pair visas in their employ.

Department of Labor calculates the effect that foreign guestworker visa holders may have on various segments of the American labor market.  As the regulations explain, the Department's goal is to ensure that the influx of foreign labor does not adversely affect the employment opportunities of U.S. workers who are similarly situated.  *See id.* (explaining that if the Department of Labor concluded that an adverse effect would result, "the ultimate determination of availability within the meaning of the INA cannot be made since U.S. workers cannot be expected to accept employment under conditions below the established minimum levels").  No comparable regulation so holds in the J-1 au pair visa context.

The H-2A visa program provides a useful contrasting case study of a guestworker visa program and the importance of the prevailing wage determination to protecting American farmworkers.  H-2A visa holders are temporary or seasonal agricultural workers, usually hired by American farmers to assist with planting, cultivating, and harvesting crops.  *See* Daniel Costa, *EPI Comments on DOL's Proposed Changes to the Adverse Effect Wage Rate Methodology for H-2A Visas for Temporary Migrant Farmworkers*, Econ. Pol'y Inst. (Jan. 31, 2022), https://bit.ly/3ifTpjE.

Under the H-2A visa program, employers are required to pay farmworkers on H-2A visas "the adverse effect wage rate."  The adverse effect wage rate acts as "a prevailing wage concept defined over a broader geographic or occupational field."

21

Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 86 Fed. Reg. 68,174, 68,176 (Jan. 31, 2022) (quotation marks omitted).[11]  The adverse effect wage rate is generally based on data collected in a multistate agricultural region and an occupation broader than a particular crop activity or agricultural activity, while the prevailing wage is commonly determined based on a particular crop activity or agricultural activity at the State or sub-State level.  Therefore, the adverse effect wage rate protects against localized wage depression that might occur in prevailing wage rates.  The adverse effect wage rate is complemented by the prevailing wage determination process, and both provide safeguards against wage depression that can arise in the performance of specific crop or agricultural activities within a regional or local geographic area.

---

[11] The Department defines a prevailing wage rate as the "average wage paid to similarly employed workers in a specific occupation in the area of intended employment."  The requirement to pay prevailing wages as a minimum is true of most employment-based visa programs involving the Department of Labor.  As an additional layer of economic protection for American workers, some visa categories—the H-1B, H-1B1, and E-3 visa programs among them—also require that the employer pay the prevailing wage or actual wage paid by the employer to American workers with similar skills and qualifications, whichever is higher, to further guard against wage depression in the industry or sector involved.  *See* U.S. Dep't of Labor, *Prevailing Wage Information and Resources*, https://bit.ly/3u8O4QG (last visited Mar. 18, 2022).

The purpose of the adverse effect wage rate is to ensure that the influx of foreign farmworkers on H-2A visas who—without these wage protections—would have been paid at rates lower than that of comparable farm workers, does not result in a stagnation or depression of the wage rates at which employers hire farm workers for comparable agricultural positions. The statutory aim, therefore, is to protect agricultural workers in the United States who are similarly employed from declining wages and working conditions. As the Department of Labor stated shortly after the creation of the modern H-2A visa program, a "basic Congressional premise for temporary foreign worker programs . . . is that the unregulated use of [nonimmigrant foreign workers] in agriculture would have an adverse impact on the wages of U.S. workers, absent protection." 86 Fed. Reg. at 68,176 (quotation marks omitted).

That statement is true of in-home childcare workers on J-1 au pair visas as well. The current State Department regulations do not take into the account the fact that in-home childcare workers on J-1 au pair visas may impact the domestic work labor market. That omission serves no one, least of all similarly situated domestic workers who are left without protection from an influx of lower cost foreign labor. Mandating that sponsor organizations comply with state and local employment laws is critical to preventing wage depression for all in-home domestic workers. Because state and local minimum wage laws are often higher than the national average, ensuring that au pair stipends meet those thresholds will begin to close the gap

between the au pair stipend and the prevailing wages of private domestic workers. Hence, ensuring that J-1 au pair sponsor organizations comply with state and local employment laws affords economic protection to domestic workers in the private domestic labor market who are similarly situated to in-home childcare workers on J-1 visas, and brings the au pair program in line with other guestworker visa programs that affect the U.S. labor market.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully urge this Court to affirm the judgment below.

Date:  March 21, 2022                    ___*/s/ Dawn L. Smalls*___
                                           Dawn L. Smalls

                                        *Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 29(a)(4)(G), and Local Rules 29.1(c) and 32.1(a)(4)(A), I certify that this brief complies with the length limitation because this brief contains 5,585 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

Pursuant to Fed. R. App. P. 32(a)(5) and (6), as well as Local Rule 32.1, this brief complies with the typeface and type style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

Date:  March 21, 2022            ___*/s/ Dawn L. Smalls*___
                                          Dawn L. Smalls

                                          *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2022, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. Counsel for all parties in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:  March 21, 2022                   */s/ Dawn L. Smalls*
                                        Dawn L. Smalls

                                        *Counsel for Amici Curiae*